In the

# United States Court of Appeals

### For the Seventh Circuit

No. 08-1333

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

XIANG HUI YE,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 06 CR 30069—**Jeanne E. Scott**, *Judge.*

ARGUED FEBRUARY 20, 2009—DECIDED NOVEMBER 17, 2009

Before BAUER, MANION, and SYKES, *Circuit Judges.*

MANION, *Circuit Judge.* Xiang Hui Ye was indicted on one count of concealing, harboring, or shielding from detection illegal aliens, and one count of hiring illegal aliens. A jury convicted Ye on both counts, and the district court sentenced him to 33 months' imprisonment. Ye appeals, arguing that the court erred in instructing the jury on the meaning of "shielding," a statutory-based term. Relying on a non-statutory

standard adopted by several other circuits, Ye claims that the district court's definition of "shielding" was too vague and too broad. Ye also contends that the evidence was insufficient to prove he intended to prevent the government from detecting his illegal alien employees. For the reasons that follow, we affirm.

## I.

Xiang Hui Ye was part-owner and manager of Buffet City, a restaurant in Springfield, Illinois. In 2005, government officials began an investigation of Buffet City's hiring practices after receiving a tip from a former restaurant employee that illegal aliens might be working there. Ye eventually was indicted under 8 U.S.C. §§ 1324(a)(1)(A)(iii) and (a)(1)(B)(i) for concealing, harboring, or shielding from detection persons he knew were illegal aliens for the purpose of commercial advantage or private financial gain (a felony), and under 8 U.S.C. § 1324a(a)(1)(A) for hiring persons he knew were illegal aliens (a misdemeanor).

At trial, the jury was presented with the following evidence. Investigators visited Buffet City in April 2005 and observed numerous Chinese and Hispanic workers. Ye did not have I-9 forms for any of the employees.[1] An

---

[1] "Form I-9, Employment Eligibility Verification Form" is a document in which an employer hiring an individual for employment in the United States attests under penalty of

(continued...)

agent advised Ye that I-9 forms and certain other employment documents were required by law. He eventually submitted I-9 forms for some of the Chinese workers, but not for any of the Hispanic employees. The Hispanic workers were paid $1000 monthly salaries in cash, without taxes withheld. Ye later met with the Hispanic employees and informed them that they were fired from their jobs, but that they would be rehired if they could produce immigration documents. Ye advised them that they could purchase fake documents in Chicago, which he would accept. One Hispanic worker was rehired, even though the documents he produced were not in his name.

In August 2005, immigration officials visited Buffet City again and observed four Hispanic workers. Ye said he did not have I-9 forms or payroll records for them because they did not have Social Security numbers. Ye also told agents the Hispanic workers were living in an apartment that he was leasing. In December 2005, agents arrested five Hispanic illegal aliens who were working at Buffet City. Ye said he did not have I-9 forms for those illegal aliens because they did not have any immigration documents.

---

[1] (...continued)
perjury that he has verified, by examining certain documents, that the employee is not an unauthorized alien. 8 U.S.C. § 1324a(b)(1); 8 C.F.R. § 274a.2. The employer is required to retain the I-9 for the later of three years after the employee's hire date or one year after his termination date. 8 U.S.C. § 1324a(b)(3).

Three Chinese illegal aliens who had worked at Buffet City testified that they were hired by Ye without producing any immigration documents and that he provided housing to them and other illegal aliens. Evidence was also presented that Ye had signed and submitted reports to the Illinois Department of Employment Security that listed only the wages paid to Chinese workers who had Social Security numbers. No Hispanic names were on those forms.

Ye testified he knew illegal Chinese and Hispanic aliens worked at the restaurant and that all of the Hispanics were illegal aliens. He stated he had helped with the hiring of the illegal aliens. Ye admitted entering lease agreements and making rent payments for apartments where illegal aliens lived, and also providing them with transportation to work. Ye declared he did not ask illegal aliens to fill out job applications, tax forms, or other employment documents, even though he knew such documents were required by law. Ye also acknowledged not keeping time cards for the illegal aliens, even though time cards were maintained for other employees.

After retiring for deliberation, the jury sent a note to the court requesting definitions of the statutory-based terms "concealing" and "shielding." Ye objected to the district court giving any definitions to the jury; the government thought definitions were warranted. The district court agreed with the government and gave the jury definitions for the two terms. The jury found Ye guilty on both counts of the indictment. Ye then moved for a judgment of acquittal or, alternatively, a new trial,

which the district court denied. The court sentenced Ye to 33 months' imprisonment. This appeal followed.

## II.

On appeal, Ye makes two arguments, both pertaining to his conviction under 8 U.S.C. § 1324(a)(1)(A)(iii). The first is that the supplemental instruction the district court gave the jury on the meaning of "shielding" was erroneous; the second is that the evidence was insufficient to prove he intended to prevent the government from detecting his illegal alien employees.

### A. Supplemental Jury Instruction

Ye claims the district court's instruction on the meaning of "shielding" was erroneous because it was too vague and too broad. The usual standard of review for whether a jury instruction accurately states the law is de novo. *United States v. Thornton*, 539 F.3d 741, 745 (7th Cir. 2008). But under Federal Rule of Criminal Procedure 30(d), when a party disagrees with a jury instruction it "must inform the court of the specific objection and the grounds for the objection. . . . Failure to object in accordance with this rule precludes appellate review, except as permitted under [plain error review]." Because Ye likely did not comply with Rule 30(d), our review

perhaps should be for plain error only.[2] *United States v. Wheeler*, 540 F.3d 683, 689 (7th Cir. 2008). And under that standard of review, we rarely reverse a conviction because of an improper jury instruction to which no objection was offered. *Id.*

But assuming Ye did comply with Rule 30(d) and preserved the argument he advances on appeal,

---

[2] After the jury requested definitions of "concealing" and "shielding," Ye asked the district court to allow the jury "to use their common sense and their knowledge in the ways of the world in applying the terms in the sense that it is presented in the instructions." The government requested specific definitions of the terms. The district court agreed with the government, and after the court read the instruction in its final form, the court and Ye's counsel had an exchange in which Ye's counsel agreed to the "acceptable wording" of the instruction subject to his prior objection. The court made clear that Ye had objected to its providing any definition of the statutory terms; rather, Ye wanted the jury to rely on its common sense understandings of the statute as written. Ye's post-trial motion reiterated the substance of his objection: "The Court defined the word[s] 'shielding' and 'concealing' for the jury as opposed to the Defendant's desire to have the common sense interpretations to be had."

Ye's argument on appeal, however, attacks the propriety of the language the court used. The government maintains that because Ye's objection at trial differs significantly from the objection he raises on appeal, he has forfeited the argument that the supplemental instruction was too vague and too broad. Because the district court was not presented with this issue, Ye's objection likely fell short of the specificity required by Rule 30(d).

he cannot prevail under de novo review because the instruction was not an erroneous statement of the law. Under 8 U.S.C. § 1324(a)(1)(A)(iii), it is unlawful when a person "knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation." As our sister circuits have recognized, "conceal," "harbor," and "shield from detection" have independent meanings, and thus a conviction can result from committing (or attempting to commit) any one of the three acts. *United States v. Rubio-Gonzalez*, 674 F.2d 1067, 1073 (5th Cir. 1982) ("Section 1324(a)[(1)(A)(iii)] by its express terms may be violated in any one of several ways—by harboring, or by concealing, or by shielding from detection or by attempting to do any of these."); *United States v. Cantu*, 557 F.2d 1173, 1180 (5th Cir. 1977) ("shield from detection" and "conceal" are not redundant); *United States v. DeEvans*, 531 F.2d 428, 430 n.3 (9th Cir. 1976) ("'[H]arbor' has a different meaning than 'conceal.'"). The only term at issue here is "shield from detection."

"Statutory interpretation begins with the plain language of the statute." *United States v. Berkos*, 543 F.3d 392, 396 (7th Cir. 2008). This court assumes that the purpose of the statute is communicated by the ordinary meaning of the words Congress used; therefore, absent any clear indication of a contrary purpose, the plain language is conclusive. *Id.* A leading dictionary

No. 08-1333

from 1952[3] tells us that the verb form of "shield" means "to cover with or as with a shield; to cover from danger or the like; to defend; to protect from distress, assault, injury, or the like" or "to ward off; to keep off or out." WEBSTER'S NEW INTERNATIONAL DICTIONARY 2312 (2d ed. 1952). The noun "detection" means "the laying open of what was concealed or hidden, or of that which tends to elude observation; discovery." *Id.* at 710. Thus defined, the term "shield from detection" essentially means "to protect from or to ward off discovery."

In light of that understanding, there appears to be no problem with the district court defining "shielding" for the jury as "the use of any means to prevent the detection of illegal aliens in the United States by the Government"; "to prevent the detection" is certainly a fair and accurate approximation of "to protect from or to ward off discovery." Ye takes issue with the "use of any means" language, however, arguing it misstates the law because it is too vague and too broad. To support his position, he points to the Fifth Circuit's opinion in *Cantu* and argues that § 1324(a)(1)(A)(iii) only proscribes conduct "tending substantially to facilitate an alien's

---

[3]  "[T]he most relevant time for determining a statutory term's meaning" is the year of the provision's enactment. *MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.,* 512 U.S. 218, 228 (1994). Accordingly, we examine how the words "shield from detection" were commonly employed and understood in 1952, the year in which that language was added to the predecessor version of § 1324(a)(1)(A)(iii). Act of March 20, 1952, Pub. L. 82-283, 66 Stat. 26.

'remaining in the United States illegally.'" 557 F.2d at 1180 (quoting *United States v. Lopez*, 521 F.2d 437, 441 (2d Cir. 1975)).

We disagree. The "use of any means" language is not vague: that wording refers to the *methods* a person may use to protect an alien from discovery (i.e., the *forms* that such conduct may take) and is consistent with § 1324(a)(1)(A)(iii),[4] which does not limit the types of conduct that can constitute shielding from detection. The "use of any means" language is not overbroad either. As elaborated below, § 1324(a)(1)(A)(iii) criminalizes *all* conduct that fits the definition of "shield from detection," not merely conduct that "tends substantially to facilitate" an alien's evasion of discovery. The "use of any means" language is overbroad only if the statute first is narrowed judicially by the "tends substantially to facilitate" overlay that several circuits have endorsed, which we now discuss.

The "conduct tending substantially" terminology originated in *Lopez*, where the Second Circuit was defining the statutory term "harboring." 521 F.2d at 440-41. With that language, the *Lopez* court rejected the defendant's argument that under § 1324 the government had to prove his assistance to aliens was part of the smuggling process, i.e., connected to the aliens' illegal entries into

---

[4] Congress did not consider the "any means" language vague: the same subsection (iii) refers to "any means of transportation." Hence, the district court's use of the term in the instruction is statutorily consistent.

the country. *Id.* at 439. Rather, the Second Circuit held that, in using the word "harbor," Congress intended to "encompass conduct tending substantially to facilitate an alien's '*remaining in the United States illegally.*'" *Id.* at 441 (emphasis added). Hence, the *Lopez* court's principal point was that the proscriptive reach of "harbor" is not limited to conduct related to the entry of aliens into the country.

In *Cantu*, the Fifth Circuit quoted the "tending substantially" language from *Lopez*, though it did so only to reject the defendant's argument (similar to the defendant's argument in *Lopez*) that "shield from detection" only prohibits *smuggling-related* shielding activity. 557 F.2d at 1180. As with the court in *Lopez*, the *Cantu* court's point was that § 1324 prohibits a defendant's helping aliens to remain in (as opposed merely to enter into) the country illegally. *Cantu* did not address the extent to which that conduct tended to facilitate the aliens' remaining in the country illegally.

Nevertheless, the Second and Fifth Circuits, as well as several other courts of appeals subsequently have employed "conduct tending substantially" in analyzing § 1324(a)(1)(A)(iii), explicitly stating or implicitly suggesting that language is a separate element necessary for conviction under the statute. *See, e.g., United States v. Ozcelik*, 527 F.3d 88, 100 (3d Cir. 2008); *United States v. Tipton*, 518 F.3d 591, 595 (8th Cir. 2008); *United States v. DeJesus-Batres*, 410 F.3d 154, 160 (5th Cir. 2005); *United States v. Kim*, 193 F.3d 567, 574 (2d Cir. 1999). In our opinion, however, that phrase should not be adopted in this Circuit.

Neither "conduct tending substantially" nor any similar wording appears in the text of the current statute or its previous versions, nor is it even mentioned in the legislative history, where we retreat only when there is a gap in the law. Rather, it is merely a judicial addition to the statute. Section 1324(a)(1)(A)(iii) provides that when a person "conceals, harbors, or shields from detection" an illegal alien (or attempts to do the same), he has committed a felony. Whether that conduct "tends substantially" to assist an alien is irrelevant, for the statute requires no specific quantum or degree of assistance.

Congress could not have been clearer: it said that concealing, harboring, or shielding from detection an alien is unlawful conduct, regardless of how effective a defendant's efforts to help the alien might tend to be. If a person commits a relatively nominal act that is proscribed by § 1324(a)(1)(A)(iii), the executive branch has the discretion to forego prosecution. Courts' overlaying the statute with the "tending substantially" veneer appropriates that discretion and also invades the province of Congress by de-criminalizing lesser forms of conduct—i.e., actions that only "tend slightly or moderately" to help an alien.

The *Ozcelik* case is illustrative of the imprudence of adopting the "conduct tending substantially" standard. 527 F.3d 88. There, the defendant had been charged and convicted under § 1324(a)(1)(A)(iii). *Id.* at 92. The evidence showed the defendant had advised an alien on how to evade detection, including instructing him to go to and from work in silence, not to get involved in

any activity, not to tell anyone his address, and to stay generally low-key. *Id.* at 100-01. The Third Circuit adopted the "conduct tending substantially" language as an *element* of § 1324(a)(1)(A)(iii). *Id.* at 100; *accord United States v. Cuevas-Reyes*, 572 F.3d 119, 122 n.2 (3d Cir. 2009) ("[O]ur decision in *Ozcelik* read [the 'conduct tending substantially to facilitate'] prong into the statute; indeed, it was that case's central holding.") The court then reversed the defendant's conviction, finding the evidence was insufficient because it did not show that the defendant's actions *tended substantially* to facilitate the alien's remaining in the country illegally. *Id.* at 101. *Ozcelik* demonstrates how what was originally an obscure, benign non-statutory phrase in one court's opinion (*Lopez*) can be transmuted into an offense element that raises the threshold for a conviction under § 1324(a)(1)(A)(iii).

Because we decline to import that statutory interpretation into the law of this Circuit,[5] we conclude that the district court's supplemental jury instruction was not erroneous.

## B. *Sufficiency of the Evidence*

Ye also argues that the evidence was insufficient to prove he intended to prevent government authorities

---

[5] Because this decision creates a conflict among circuits, it has been circulated to all judges of this court in regular active service under Circuit Rule 40(e). No judge favored a hearing en banc.

from detecting the presence of the illegal aliens.[6] "A defendant attacking the sufficiency of the evidence used to convict him faces a nearly insurmountable hurdle." *United States v. Morris*, 576 F.3d 661, 665-66 (7th Cir. 2009) (quotation marks and citations omitted). Viewing the evidence in the light most favorable to the government, we will reverse a conviction only if no rational jury could have found the defendant guilty beyond a reasonable doubt. *Id.* at 666.

At trial, Ye admitted he knew illegal aliens worked at Buffet City and that all of the Hispanic workers were illegal aliens. He admitted he did not require the illegal aliens to fill out job applications, tax forms, or other employment documents. Ye admitted he filled out required I-9 forms only for his legal employees; he also acknowledged that he did not keep time cards for his illegal workers, even though he kept them for his legal workers. Had these records been maintained properly, the illegal aliens could have been exposed. A reasonable jury could have concluded that Ye's poor paperwork management was indicative of an intent to prevent the government from discovering the illegal aliens.

---

[6] The district court instructed the jury that in order to convict Ye on the § 1324(a)(1)(A)(iii) count, it had to find he "concealed, harbored or shielded from detection an illegal alien *intending to prevent government authorities from detecting the presence of such alien*." (emphasis added). Neither party challenged this instruction, so we do not decide whether the italicized portion is an accurate statement of the law.

Ye also leased apartments for the illegal aliens, thereby permitting them to keep their identities under wraps. In addition, Ye paid the Hispanic illegal aliens in cash. He submitted reports to the Illinois Department of Employment Security listing only the wages paid to Chinese workers who had Social Security numbers; the names of Hispanic and Chinese illegal aliens without Social Security numbers were not included in those reports. Ye also told the Hispanic illegal aliens he fired that he would rehire them if they returned with any documents—even bad ones—and suggested they could purchase fake documents in Chicago. And one of the fired Hispanic illegal aliens was rehired after producing obviously falsified documents. This ample evidence was sufficient to permit a reasonable jury to find beyond a reasonable doubt that Ye intended to prevent the government from detecting the illegal aliens.

## III.

The district court did not misstate the law when it defined the term "shielding" in the supplemental jury instruction. In addition, the evidence presented at trial was sufficient for the jury to find beyond a reasonable doubt that Ye's actions were done with an intent to prevent the government from detecting illegal aliens. Accordingly, we AFFIRM the judgment of the district court.