In the

# United States Court of Appeals
## For the Seventh Circuit

No. 12-3724

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ALEX A. CAMPBELL, also known as
DAVE, also known as DADDY,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:10-cr-00026-1 — **Robert W. Gettleman**, *Judge.*

ARGUED SEPTEMBER 12, 2014 — DECIDED OCTOBER 21, 2014

Before EASTERBROOK, SYKES, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* Defendant-Appellant Alex Campbell, also known as "Daddy", "Dave" and "Cowboy", recruited young women in the United States illegally to work for him as masseuses and, ultimately, prostitutes. He referred to these women as his "Family". At first, Campbell enticed the women into joining his Family by offering them comfortable places to live, and jobs in massage parlors with

no expectation that they perform sexual services. Once he had gained their trust, Campbell required the women to break their ties with their relatives and friends, and confiscated their identification, immigration documents and money. Campbell renamed them, branded them with tattoos, abused them, and forced them to engage in prostitution for his benefit.

Eventually, one of Campbell's victims turned to law enforcement. This led to an investigation, which resulted in an eleven-count indictment. A jury found Campbell guilty on all counts and the district court sentenced him to life imprisonment. Campbell appeals his conviction of two counts of harboring illegal aliens, one count of extortion under the Hobbs Act, and one count of sex trafficking under the Trafficking Victim's Protection Act. Specifically, Campbell contends that the district court erred in failing to instruct the jury that harboring requires proof of his intent to shield the alien from detection by law enforcement, and the Government's evidence of such intent was insufficient. Campbell also contends that the Government's evidence was insufficient to establish the required interstate commerce elements under the Hobbs Act and the Trafficking Victim's Protection Act.

## I.    Background

On January 12, 2010, the Government filed a Complaint in the United States District Court for the Northern District of Illinois against Campbell and Danielle John. Both Campbell and John were indicted on April 15, 2010. On November 29, 2010, John withdrew her not-guilty plea pursuant to a plea agreement. On December 30, 2010, a Superseding Indictment was filed against Campbell alone, containing the

following eleven counts: obtaining labor and services of others by force, serious harm and abuse, in violation of 18 U.S.C. § 1589 (Counts 1, 2 and 3); concealing, harboring and shielding illegal aliens for commercial advantage, in violation of 8 U.S.C. §§ 1324(a)(1)(A)(iii), 1324(a)(1)(A)(v)(II) & 1324(a)(1)(B)(i) (Counts 4, 5, and 6); concealing identity and immigration documents, in violation of 18 U.S.C. § 1592(a) (Counts 7, 8, and 9); sex trafficking, in violation of the Trafficking Victim's Protection Act, 18 U.S.C. § 1591(a) (Count 10); and extortion, in violation of the Hobbs Act, 18 U.S.C. § 1951(a) (Count 11). A jury found Campbell guilty on all counts, but the district court granted Campbell's motion for acquittal as to Count 5. Campbell was sentenced on all remaining counts. On appeal, Campbell only challenges his conviction of the following: Counts 4 and 6, for harboring illegal aliens "Diamond" and "Loni", respectively; Count 10, for sex trafficking related to Diamond; and Count 11, for extortion of "Masha".[1] Accordingly, we will focus on the evidence adduced at trial related to Campbell's interactions with Diamond, Loni and Masha. And if Tolstoy was correct that every unhappy family is unhappy in its own way, some

---

[1] Four victims testified at trial under their real first names. They testified about the "Family" names Campbell gave to them, and they referred to each other by those names. In the appellate briefing, the parties refer to two of the testifying victims—"Diamond" and "Loni"— by the names given to them by Campbell. The parties refer to a third victim by her first name, "Masha", and not her Family name given by Campbell, "Baby". (Reference to the fourth testifying victim has been omitted from this opinion because the convictions being appealed do not relate to her.) In this opinion, we refer to the victims by the same names used by the parties in the briefing.

detail will be necessary to show the way in which Campbell made his "Family" uniquely unhappy.

### A. Diamond

Diamond, who was born in Ukraine, came to the United States in 2007 to be an au pair in Ohio and Georgia. Her last au pair assignment ended in November 2007, when she had a month left on her visa. Seven months later, Diamond, then 20 years old, had moved to Chicago and was looking for work. In June 2008, Diamond was hired by Bo Liu, Campbell's business associate, to be a masseuse at a massage parlor, after she responded to an internet advertisement for an administrative assistant. Shortly after being hired, she met Campbell, who was 43 years old, used the name "Dave", and was introduced to Diamond as the owner of the massage parlor. During their first conversation, Campbell assured Diamond: "In my spas, there are no illegal activities." On the same day, she met John, who was known as "Princess", and who was also born in Ukraine. Diamond understood John to be the manager of the spa, although she took orders from Campbell. Diamond met another female employee of the spa, "Nadya", who was born in Ukraine. Diamond noticed that John and Nadya had identical tattoos.

After her first day of work, Campbell drove Diamond home in his car. At the beginning of her time at the spa, Campbell treated Diamond nicely, gave her rides, asked her about her life, and—in her mind—became her friend. Campbell asked Diamond about her past in Ukraine, her time in the United States, and the roommate with whom Diamond shared a small apartment. He asked about her legal status in the United States, and Diamond confided in him that she was not in the country legally. Campbell remarked to Dia-

mond that it is hard to be in the United States alone, and she needed someone who could give her advice and help her.

On June 25, 2008, after Diamond had known Campbell for a week, Campbell gave Diamond a ride after work. They ate dinner and Campbell served her alcohol until she became intoxicated. Campbell described the "Family" to her. He said the Family was an organization of friends that help each other. He told her that he was a member of the Family, and he gave $5,000 a month to other members of the Family. He asked her if she would like to join the Family. She asked if she would need to pay money to join. He said that she would not need to pay money, but he told her that every member of the Family had a horseshoe tattoo. He said that the tattoo allows members of the Family to identify each other and, "if you need help, and they see this tattoo, they will help you." At the end of the conversation, while Diamond was still intoxicated, Campbell took Diamond to a tattoo shop and Diamond received her first tattoo, a horseshoe on her neck.

Within a week of receiving the tattoo, Campbell and Diamond began a sexual relationship. Campbell had Diamond refer to him as "Daddy". Campbell told Diamond that she needed a pseudonym to give to massage clients. At first, he let her choose the name, but later, Campbell gave her a new name: "Diamond". He told her that she was like "a diamond in the rough," but it takes "a lot of pressure to actually make it a real diamond." Shortly after their sexual relationship began, Campbell had Diamond receive a second tattoo, this time on her chest. The tattoo depicted a horseshoe, with "Cowboy"—Campbell's self-appointed moniker—written at

the top, and "Diamond" written inside the horseshoe, along with "AAC" and "917", Campbell's initials and his birthday.

For two weeks after being tattooed, Diamond was paid for her work at the spa. Then, Campbell told her that he would keep all the money she earned in an envelope with her name on it. He told her that he would keep it safe, and if she needed it, she could have it at any time. Diamond felt that Campbell treated her well during this time, and she thought she was falling in love with him.

Campbell told Diamond that she would have to undergo an orientation for joining the Family. This orientation included training on the Family rules, such as the requirement to keep in constant contact with Campbell via phone calls and text messages, and to have no contact with "society" (Campbell's word for non-Family members). During orientation, Campbell took Diamond's passport, and told her he was giving it to Danielle John so it would be kept safe.

Campbell told Diamond that her roommate was jealous of her, and would report her to immigration authorities which would result in Diamond being deported. Campbell demanded that Diamond immediately move out of her shared apartment and into an apartment he provided. At first, Diamond moved into John's apartment, which was in the building that housed "Elle Spa," a massage parlor under Campbell's control. In late-July 2008, Campbell rented a studio apartment for Diamond in the same building. Campbell furnished the apartment and paid the bills.

At the end of July 2008, Campbell learned that Diamond had smoked a cigarette after he had previously forbade her from smoking for the day. Campbell told Diamond that she

had cheated on the Family, and he ordered her to take off her clothes, and he beat her with a belt. The same night, John took all of Diamond's identification documents and bank cards. While Campbell told Diamond she could not talk to anyone other than Campbell and John, John erased all of the phone numbers in Diamond's phone except Campbell's and John's numbers. While Campbell told Diamond she was not allowed to keep track of money, John erased a record of earnings Diamond had been keeping on her phone.

After that incident, Campbell began inflicting what he referred to as "punishments" on Diamond. He forbade her from speaking to her parents, and from smoking, drinking and eating sweets. Campbell repeatedly beat her with his belt or hand, and he forced her to extinguish a lit cigarette using her naked buttocks. Campbell told Diamond that he had video surveillance cameras throughout the spas where Campbell forced Diamond to work without pay seven days a week. Campbell told her that if she tried to run from him he would find her. He emphasized that she was in the country illegally, had no passport, no identification, no money and no friends in the United States. Campbell claimed he was a professional assassin, who was good at tracking and killing people. He told Diamond repeatedly that if anyone in the Family went to the authorities, he would kill that person or he would "just come to the courtroom and shoot everybody." Campbell told her that she should say nothing if she were ever questioned by law enforcement, and that the police often beat and raped women. Campbell ordered Diamond to spy on other spa employees and report to Campbell what they did and said.

In September 2008, Campbell told Diamond he was a "pimp" and she would engage in prostitution for his benefit. He said that all of the members of the Family engaged in prostitution for him, and he ordered John to teach Diamond the mechanics of how prostitution worked, such as how to negotiate with customers, screen customers to ensure they were not law enforcement agents, and which sex acts were expected. In October 2008, Campbell ordered Diamond to have sex with his business partner Bo Liu, get pregnant from him, and give him the baby. Diamond agreed to the request, fearing for her life. Bo Liu made monthly payments to Campbell for this.

In November 2008, Diamond was late in texting Campbell that she had finished a massage. Campbell responded by beating Diamond with his belt and forcing her to live in Elle Spa. The conditions in the spa were unsanitary, and she was given little food to eat, going for stretches of up to 48 hours without food. Campbell also began requiring Diamond to perform sex acts for money at Elle Spa. On Christmas day 2008, Diamond made $800 performing sex acts in the spa. When she gave the money to Campbell, as she was always required to do, he rewarded her by allowing her to spend the night on a couch in John's apartment. At the beginning of January, Campbell forced Diamond to live in a different spa under his control. She spent between four and five months living in this spa, which did not have a shower or a bathtub. She washed in a sink, and was forced to use semen-stained towels to wash and dry.

In January 2009, when Diamond asked for a thousand dollars to send to a sick relative in Ukraine, Campbell told her that she was out of the Family, and would have the

choice of going through a "reorientation" or having Campbell "cut [her] tattoos off and put heroin in [her] veins and drop [her] off in some crack [house]." During the reorientation in 2009, Diamond was permitted to speak only English, and she was not permitted to talk with anyone outside of work, including Campbell, without permission.

In January 2009, Campbell had an appearance in court. Afterward, he told Diamond that a former Family member named Amy had complained to him about the police, but she did not appear in court and so he was no longer in trouble. Campbell opened champagne in celebration, and told Diamond "his people took care of [Amy]," which Diamond understood to mean that Campbell's associates killed her.

In January and February of 2009, Diamond continued performing sex acts for money at the spas when instructed by Campbell. Sometimes during that period, Campbell was worried about undercover law enforcement agents, and he instructed Diamond to only perform massages. During this time, the spas where she worked advertised in a magazine called, "Chicago After Dark," and on the classified advertisement website, "Craigslist". During late 2008, all of 2009 and early 2010, Diamond placed advertisements for the spas on Craigslist.

When Diamond met Masha, or "Baby", at a spa in January 2009, Diamond was angry because she assumed Masha was living in the studio apartment Campbell had initially rented for Diamond. Diamond asked Campbell why Masha lived in the apartment and Diamond was forced to live in the spa. Campbell took her to a massage room, beat her, and then told her to clean up and not reveal to Masha that he had beaten her. In February 2009, Campbell ordered Diamond

and Masha to perform sex acts on each other while Campbell filmed them with his phone. In March or April 2009, Campbell directed Diamond to call Masha's parents in Belarus and obtain from them Masha's phone number in the United States. Around the same time, Campbell instructed Diamond to meet Masha in a spa parking lot and receive a package from her. Diamond received the package and put it in the spa safe as instructed.

In June 2009, Campbell moved Diamond into a house with John, and John and Campbell's child, known as "Europe". During the six months that Diamond lived in this house, other members of Campbell's Family lived there from time to time, including Loni. Campbell asked Diamond to tell Loni about the rules of the Family (e.g., not to talk to anyone outside the Family, to give all money to Campbell, to text Campbell about customers and whereabouts, etc.), but he told Diamond not to tell Loni her real name or that the Family members were required to engage in prostitution. In August or September 2009, Loni hit a fence while driving a car. Campbell instructed John to give Diamond her identification and driving permit. Campbell instructed Diamond to tell the police that she was driving and John was in the passenger seat. When the police arrived, Diamond complied and the car was towed.

Throughout 2009, Campbell continued inflicting an array of "punishments" on Diamond. Campbell beat Diamond with his fists, his belt, a pool cue and a two-by-four board. Campbell extinguished a lit cigarette on Diamond's bare foot. After a repeat customer brought her flowers on Valentine's Day, Campbell accused Diamond of asking the customer for help getting out of the Family, and he beat her

with a large umbrella. When Diamond only made $20 in gratuities after a day's work, Campbell forced her to eat a $20 bill. When Campbell decided Diamond did not smile enough in the presence of a new Family recruit, he beat her. When Campbell caught Diamond and Loni speaking to each other in Russian, he beat them both. At times, Campbell beat Diamond until she begged him to kill her.

In September 2009, Campbell ordered Diamond to call Masha's parents in Belarus a second time to obtain Masha's new phone number in the United States. Soon afterwards, Campbell instructed Diamond to receive a package from Masha outside the Day and Night Spa. Diamond did as instructed. As Diamond stood alone with Masha in the parking lot, Masha gave Diamond the package. Then Masha hugged her and said: "Everything [is] gonna be okay." Unbeknownst to Diamond, the exchange in the parking lot was being monitored by law enforcement agents.

### B. Loni

Loni was born and raised in Ukraine, and came to the United States on a four-month visa in May 2007 when she was 20 years old. She came to the United States "to see a new country and meet new friends." In September 2008, Loni was working as a waitress in Chicago when she met Campbell, who went by the name "Dave". Campbell began referring to her by the name "Loni", which he made up for her, on the day they met. In November 2008, when she was 21 years old, Loni began working for Campbell as a masseuse in three of his spas, including the Elle Spa and the Day and Night Spa. During the first month of her employment, Campbell paid Loni in cash 35 percent of the money the spa

received for each massage she performed. During the second month, Campbell paid her 50 percent.

When she began working for Campbell, he asked Loni about her legal status in the United States. When Loni told him that she was in the United States illegally, Campbell responded that he could help change her status. Loni was interested in his offer because she felt that if she were in the country legally, she could go to school in the United States and find a better job. In December 2008 or January 2009, at his request, Loni gave Campbell copies of her passport, driver's license, social security card, birth certificate and other identification documents so he could help her obtain legal status.

In February 2009, Campbell gave Loni a car as a birthday gift. In a similar manner to what he had done with Diamond, Campbell began telling Loni about the Family. He told her that he helped members of the Family. He also told her about a woman who had been working for him who complained about him to the police. He said the police could not prove a case against him because the woman disappeared. On another occasion, Loni overheard Campbell ordering John to tape plastic to the floors and walls of the house basement, because he was planning to dismember a dead body. Campbell told Loni multiple times that he had the ability to call the authorities and have people deported, and he had caused a woman to be deported because she had wronged him.

In May 2009, Campbell moved Loni out of the apartment she had been sharing with a friend, and moved her into the house occupied by John, Diamond and others. Campbell convinced Loni to give him her money and cell phone,

which he promised to "keep safe" for her. Shortly after Loni moved into the house, John took Loni's passport and credit cards. Campbell and John said that she did not need money because they would pay all of her bills. Later, Loni asked Campbell and John to return her passport, but they refused. On May 27, 2009, Campbell told Loni she was joining the Family and getting a tattoo, and Loni said that she did not want a tattoo or to be part of the Family. Campbell said the decision was already made, and John drove Loni and Diamond to a tattoo shop and Loni received a tattoo on her neck modelled after the tattoo on Diamond's neck. During the summer of 2009, Campbell required Loni, Diamond and John to receive tattoos on their backs and wrists. Each woman received a tattoo covering 70 percent of her back which depicted a scroll containing a manifesto drafted by Campbell asserting that each woman "live[s] for" Campbell "till death."

Campbell and John told Loni the rules of being part of the Family, just as they had done earlier with Diamond. Campbell told her repeatedly that he had friends in law enforcement, and if she went to the police, he would find out. He said the police would deport her. Loni, like Diamond, was required to work in the spas every day and give Campbell all of the money she earned. Campbell beat Loni repeatedly and forced her to have sex with him. On one occasion, Campbell beat Loni and Diamond with his belt, and then required Loni and Diamond to strike another female spa employee. Campbell required Loni to watch as he beat Diamond with a pool cue. During the beating, when Diamond shouted in Ukrainian, Campbell asked another Family member for a translation. Upon learning that Diamond had

exclaimed, "Oh my God," Campbell told her: "Yes, I am your God."

In early October 2009, Loni asked Campbell to allow her to travel to Ukraine. She lied to him, saying that her mother was sick and she would return to the United States in a couple of months to rejoin the Family. On October 5, 2009, Campbell told her that she would be permitted to go to Ukraine, and John booked Loni a plane ticket for the next day. On October 6, 2009, John drove Loni to the airport, and only then did John give Loni her passport and the plane ticket. Loni boarded the plane with no intention of returning to the United States.

### C. Masha

Masha was born and raised in Belarus, and came to the United States in June 2007 with a four-month visa. When her visa expired, Masha stayed in the country because she liked the United States and wanted to attend nursing school in the country. In 2008, when she was 20 years old, Masha met Campbell while she was attending a massage therapy school in Chicago. Campbell asked Masha questions about her life and background, including her immigration status in the United States. Campbell told Masha that he worked for immigration services, and he could help her obtain a green card. He told her that he had obtained green cards for many people, and it would not be a problem obtaining one for someone in her situation. Campbell said that a green card would cost her $13,000, plus an additional "upfront payment" of $1,500. In September 2008, Masha began making weekly $1,000 payments to Campbell for a green card. Pursuant to Campbell's request, Masha gave Campbell copies of her passport and all other identifying information, including

the names and telephone number of Masha's parents in Belarus. Campbell obtained Masha's credit report without her knowledge, and required Masha to undergo a medical examination at her own expense, purportedly because it was a step in the immigration process.

Masha obtained the money for her weekly payments by working in Campbell's spas (the Day and Night Spa, Elle Spa and Club Tan) as a masseuse, as well as from friends and her parents in Belarus. Campbell prohibited Masha from talking with her co-workers, and in particular, he prohibited discussion of Masha's life, history, address or real name (Campbell's name for Masha was "Baby"). Campbell suggested Masha move into one of his apartments, which he offered at a discount price. Shortly after she moved in the apartment, Campbell evicted her for employing the chain lock on the apartment door. Campbell broke the chain lock and told Masha to share John's apartment, but Masha refused and instead moved into a friend's house. Campbell told Masha about the Family, in similar terms to what he used with Diamond and Loni. Campbell told Masha that she was required to get a tattoo, but she said she needed additional time before getting the tattoo. Campbell told Masha that she was already in the Family, even without the tattoo.

Campbell asked Masha to engage in prostitution with the customers at the spas, but she refused. In November of 2008, Masha was late making her $1,000 weekly payment. Campbell told her that as punishment, she would be required to have sexual intercourse with him and his business partner, Bo Liu, at Elle Spa. She complied, and Campbell charged Bo Liu $300. Campbell warned Masha that he was "working on [her] immigration status. And [she] better do whatever he

says." Afterwards, Campbell required Masha to have sex with him weekly. He would tell her that her body belongs to him, and if she refused, he would have her deported with a single phone call. One day, while Masha was working at Club Tan, Campbell had sex with Masha, and then ordered Masha and Diamond to have sex with each other. Masha initially refused, but eventually complied. Campbell recorded this encounter using his mobile phone.

In March 2009, when Masha finished paying $14,500 to Campbell, he told her that everything was going well, and her green card would be issued soon. Campbell told Masha to return to Belarus, where he would send her the green card and other documents she would need to enter the United States. At first Masha planned to return to Belarus as instructed by Campbell, but then she consulted a lawyer without Campbell's knowledge. The lawyer advised Masha not to leave the United States, stating that she would not be allowed to return.

Masha told Campbell that she refused to leave the United States. Campbell responded that, in order to "punish" her for refusing to go to Belarus, Masha would be required to pay him $10,000, either in cash or by working for him for six months, seven days a week, without pay. Masha opted to pay the $10,000 in weekly installments of $1,000 because she feared if she continued working for Campbell, he would continue forcing her to have sex with him. When Masha made the final payment of the $10,000 "punishment", Campbell told Masha that her refusal to go to Belarus caused Campbell "a lot of problems with getting [legal] status for somebody else," and therefore Masha would be required to pay an additional $6,000 "fine". Campbell told Masha that

he had the address of her parents in Belarus, and if Masha did not pay the money, he would send the video of Masha and Diamond having sex to Masha's parents, as well as put the video on the internet, and have Masha deported. Masha paid Campbell the $6,000 in weekly installments of $1,000 a week. After Masha paid the $6,000 "fine", Campbell claimed that she had only paid $5,000, and would be required to pay an additional $1,000, which she could satisfy by paying $500 and having sex with him. After Masha paid $500 and had sex with Campbell, he told Masha that she could get out of the Family only if she paid him an additional $5,000. Campbell told Masha that, otherwise, "the only way out of the Family is death."

After Campbell demanded $5,000 for leaving the Family, Masha changed her phone number in order to evade Campbell. Campbell directed Diamond to call Masha's parents in Belarus to obtain Masha's new number. Diamond complied, and in August 2009, Campbell called Masha at her new number. Masha then began recording her calls with Campbell. During one of these calls, Masha told Campbell that she only had $1,500 of the $5,000 Campbell was demanding. Campbell responded that he was going to give Masha her "birthday present," which was that if she gave Campbell the $1,500 and "spend two hours with your Daddy today," she would owe him no more money, and "[i]t's over with." Masha met Campbell at the Day and Night Spa and had sex with him and Bo Liu.

Masha again changed her phone number. At Campbell's direction, Diamond again called Masha's parents in Belarus and obtained Masha's new number. On September 1, 2009, Campbell called Masha and told her she owed him an addi-

tional $5,000 for changing her telephone number. Masha said she had no more money to pay Campbell. Campbell responded with a tirade about "the problem [Masha] created," which concluded with the threat that if Masha did not pay, "we will go to f—ing war."

Masha responded by contacting U.S. Immigration and Customs Enforcement. Under the direction of ICE agents, Masha engaged in a series of monitored and recorded phone calls with Campbell; and, under the direction of, and surveillance by, ICE agents, she made a series of payments to Campbell using funds provided by ICE. Specifically, on September 11, 2009, Masha made a payment of $1,200 with funds provided by ICE. Masha told Campbell that the money had come from her parents in Belarus.

On September 25, 2009, Masha told Campbell that she did not have any more money to pay him. Campbell threatened that unless she paid him more money, he would post photos on the internet of her having sex with him, Diamond, and Bo Liu, and would send the same materials on a DVD to her parents in Belarus. Masha then made a $500 payment to Campbell, using funds supplied by ICE agents. In early October, Campbell continued to demand more money, and again threatened to post the sex tape on the internet for viewing "all over the f—ing world." Masha made another payment to Campbell using funds supplied by ICE agents.

In December 2009, Loni was contacted by U.S. law enforcement agents and spoke with them about Campbell at the U.S. embassy in Ukraine. On January 13, 2010, ICE agents took Diamond from the Day and Night Spa, where Diamond had been living and working.

In January 2012, Diamond, Loni, Masha, John, and another former Family member testified against Campbell at his jury trial. After the jury rendered its verdict, the district court sentenced Campbell, who had a prior conviction for attempted murder, to a total sentence of life imprisonment.

## II.    Harboring

Campbell challenges his convictions for harboring illegal aliens Diamond and Loni. Specifically, Campbell contends that (1) the district court erred in instructing the jury on the intent element the Government must prove in order to convict him of harboring, and (2) the evidence at trial was insufficient for the jury to find that the intent element was proven. Before discussing the merits of these issues, we first discuss the magnitude of the burden Campbell faces in challenging the harboring convictions.

When a party disagrees with a jury instruction it "must inform the court of the specific objection and the grounds for the objection before the jury retires to deliberate." Fed. R. Crim. P. 30(d). Failure to object in accordance with Rule 30(d) precludes appellate review, except as permitted under plain error review. *See id*. It is undisputed that Campbell did not comply with Rule 30(d); accordingly, we review Campbell's jury instruction challenge for plain error only.[2] *See*

---

[2] The Government contends that even plain error review is foreclosed because Campbell's prior counsel "provisionally accepted" the challenged jury instructions prior to Campbell's first trial in August 2011. The first trial (in August 2011) ended in a mistrial; Campbell's convictions were the result of his *second* trial (in January 2012), and that is the only trial at issue here. After the mistrial, the district court did not indicate to the parties that any waivers from the first trial would carry over

*United States v. Ye*, 588 F.3d 411, 414 (7th Cir. 2009). With re-
spect to Campbell's sufficiency-of-evidence challenge, in the
ordinary case, "[w]e will overturn a jury verdict for insuffi-
ciency of the evidence only if, after viewing the evidence in
the light most favorable to the government, the record is de-
void of evidence from which a reasonable jury could find
guilt beyond a reasonable doubt." *United States v. Aslan*, 644
F.3d 526, 540 (7th Cir. 2011). However, as with Campbell's
jury instruction challenge, Campbell concedes that he raised
his sufficiency-of-evidence challenge for the first time on ap-
peal, so we review that challenge for plain error only. *See id.*

"In order to reverse for plain error, we must find (1) error
(2) that is plain, and (3) that affects the defendant's substan-
tial rights." *Id.* (citing *United States v. Olano*, 507 U.S. 725, 732
(1993)). "An error 'affects the defendant's substantial rights'
when it is prejudicial, that is, when it has affected the out-
come of the district court proceedings." *Id.* at 540–41 (quot-
ing *Olano*, 507 U.S. at 734); *see also United States v. Ramirez-
Fuentes*, 703 F.3d 1038, 1042 (7th Cir. 2013) (stating that the
error must "represent[] a miscarriage of justice such that the
defendant probably would have been acquitted but for the"
error) (quotation omitted). Finally, the decision to correct a
plain forfeited error affecting substantial rights is left within
the discretion of the court of appeals, and we "should not
exercise that discretion unless the error seriously affects the

---

to the second trial, and it is unnecessary for us to decide whether such an
indication would have been effective. Under the facts of this case, we
decline to find that Campbell waived (rather than forfeited) his right to
challenge the harboring instructions. *See generally United States v. Pappas*,
409 F.3d 828, 829–30 (7th Cir. 2005) (discussing forfeiture and waiver).

fairness, integrity or public reputation of judicial proceed-ings." *Olano*, 507 U.S. at 732 (quotation omitted).

Campbell was convicted of harboring illegal aliens Diamond and Loni for the purpose of private financial gain in violation of 8 U.S.C. § 1324(a)(1)(A)(iii), (a)(1)(A)(v)(II), and (a)(1)(B)(i). The harboring statute imposes criminal liability on one who "knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation." 8 U.S.C. § 1324(a)(1)(A)(iii); *see also* 8 U.S.C. § 1324(a)(1)(A)(v)(II) (imposing liability for one who "aids or abets the commission of any of the preceding acts"), (a)(1)(B)(i) (stating that one who violates subparagraph (a)(1)(A)(iii) "in which the offense was done for the purpose of commercial advantage or private financial gain, [shall] be fined under Title 18, imprisoned not more than 10 years, or both").

The terms "'conceal,' 'harbor,' and 'shield from detection' have independent meanings, and thus a conviction can result from committing (or attempting to commit) any one of the three acts." *United States v. Ye*, 588 F.3d 411, 414 (7th Cir. 2009). These terms are not defined in the statute, and courts have devoted substantial effort to pinning down their precise meanings in the context of the harboring statute.[3] *See,*

---

[3] We refer to 8 U.S.C. § 1324(a)(1)(A)(iii) as the "harboring statute" as a shorthand only, since the statute prohibits concealing and shielding from detection in addition to harboring.

*e.g.*, *United States v. Vargas-Cordon*, 733 F.3d 366, 379–83 (2d Cir. 2013); *United States v. Costello*, 666 F.3d 1040, 1042–50 (7th Cir. 2012). In *Costello*, which was decided after the trial in this case, we stated:

> The string of prohibitions in section 1324(a)(1)(A)(iii) is most naturally understood as the following series of loophole-stopping near synonyms: 'concealing' is concealing; 'shielding from detection' usually is concealing but could involve bribing law enforcement authorities—in other words paying someone else to conceal (yet the shade of difference is tiny—no surprise in a string of near synonyms); and the office left to 'harboring' is, then, materially to assist an alien to remain illegally in the United States without publicly advertising his presence but without needing or bothering to conceal it … .

*Id*. at 1046–47. In *Costello*, we cautioned that "harboring" should not be defined in such a manner as to sweep far beyond "concealing" or "shielding from detection." *Id*. at 1047. In the end, we settled on the following "harboring" definition: "providing (or offering … ) a known illegal alien a secure haven, a refuge, a place to stay in which authorities are unlikely to be seeking him." *Id*. at 1050.

In this case, the parties agree that we should look to *Costello*, but the parties see different things in *Costello*. The Government says that "*Costello* creates an effect-based, rather than purpose or intent based test," and "harboring is understood properly as requiring that a defendant, regardless of his specific intent or purpose for doing so, provide shelter or

other assistance (such as employment or transport) to an il-
legal alien in a place where authorities are unlikely to seek
him." Appellee Br. at 33, 34. Campbell says that, in *Costello*,
"this Court established that the individual's alien status
must be the driving purpose for the provision of shelter such
that there also exists the intent by the defendant to help the
alien avoid detection by the authorities." Appellant Reply
Br. at 6; *see also* Appellant Br. at 14 ("[T]he Government must
establish … that the defendant provided an alien shelter for
the purposes of evading detection by law enforcement or
immigration authorities."). Campbell contends that the dis-
trict court erred in failing to instruct the jury regarding this
intent element.[4]

---

[4] The district court gave the following jury instruction:

> To sustain a concealing or harboring charge, the government
> must prove each of the following propositions:
>
> First, that Diamond (Count Four) … [and/or] Loni (Count
> Six) was an alien and remained in the United States in violation
> of law;
>
> Second, that the defendant concealed or harbored or shel-
> tered from detection Diamond (Count Four) … [and/or] Loni
> (Count Six) within the United States, or attempted to do so; and
>
> Third, that the defendant either knew or recklessly disre-
> garded the fact that Diamond (Count Four) … [and/or] Loni
> (Count Six) was an alien who remained in the United States in
> violation of law.

App. 31; *see also id*. 33 ("If you find that the government proved beyond a
reasonable doubt the offense charged in Counts Four … and/or Six of the
indictment, then you must also determine whether the government
proved beyond a reasonable doubt that those offenses were committed
for purposes of commercial advantage or private financial gain.").

Based upon the evidence adduced at trial, we need not resolve this dispute or decide whether the jury instructions accurately stated the law. Even if Campbell is correct that the Government must establish that he provided Diamond and Loni shelter for the purpose of evading detection by law enforcement or immigration authorities, we find that any instructional error in this regard did not affect Campbell's substantial rights. Although preventing detection by law enforcement was not Campbell's sole purpose for providing Diamond and Loni with housing and employment, and for concealing their identities and whereabouts,[5] the evidence amply showed such prevention was an integral part of Campbell's overall "Family" plan. *Cf. Vargas-Cordon*, 733 F.3d at 383 (holding that there was sufficient evidence of an intent to prevent detection by authorities where defendant's "motivations were both to continue their relationship and to prevent authorities from returning [the alien] to government-arranged foster care").

Campbell's efforts to profit from Diamond's and Loni's labor could be successful only if he were able to prevent law enforcement from detecting their illegal status and deporting them. Campbell moved both women into housing he provided, confiscated all of their identifying documents, forced them to live and work under assumed names in an environment he controlled completely, and prohibited them from communicating with anyone outside his control, including all friends and family who knew their real names.

---

[5] As the jury reasonably found, one purpose was for Campbell's commercial advantage or private financial gain.

Campbell instilled in both women a fear of dire consequences if they were to come to the attention of law enforcement, including immigration authorities. Campbell convinced them that if they went to law enforcement, Campbell would kill them, or they would be beaten, raped and/or deported by the authorities themselves. It is clear that, in Campbell's mind, the ties that bound Diamond and Loni to his Family included their illegal status and the efforts Campbell took to prevent their detection by authorities. In short, the evidence demonstrates that Campbell provided Diamond and Loni shelter for, *inter alia*, the purpose of evading detection by law enforcement, including immigration authorities.[6]

On appeal, Campbell contends he acted in ways which heightened Diamond's and Loni's risk of detection by immigration authorities. Campbell points out that he rented an apartment in Diamond's real name, and gave Loni a car with a temporary registration in her real name. However, the evidence showed that Campbell took these actions during his courtship phase, prior to Diamond and Loni joining his Family. Once Diamond joined the Family, and Campbell had secured all of Diamond's identification documents, Campbell moved Diamond out of the apartment rented in her real name, and she never returned. The address Campbell gave for Loni's temporary registration was an address at which Loni lived prior to joining the Family. Once Loni joined the Family, and Campbell had secured all of Loni's identification documents, Campbell moved Loni into housing he con-

---

[6] Although the word "harbor" conjures images of placid water and safe vessels, there is nothing in the harboring statute that requires a defendant's motives or methods to be benevolent.

trolled, and she never returned to the address listed on the registration.

Campbell also notes that he gave Diamond her identification documents twice: once to seek treatment in a hospital, and once when he required her to falsely tell the police that she, rather than Loni, was driving the wrecked car. The evidence showed that, on both occasions, Campbell reasonably believed Diamond would not alert the authorities regarding her illegal status or Campbell's abuse, based on Campbell's prior threats and his accompanying her to the hospital and the police station. None of the incidents highlighted by Campbell seriously undermines the ample evidence that Campbell provided Diamond and Loni with shelter for the purpose of, *inter alia*, evading detection by law enforcement, including immigration authorities.

We find that any instructional error did not affect Campbell's substantial rights because, even under Campbell's preferred intent standard, the outcome of the proceedings would not have been different. *See Vargas-Cordon*, 733 F.3d at 383; *cf. United States v. Courtright*, 632 F.3d 363, 372 (7th Cir. 2011) ("We need not determine whether these instructions were erroneous for the simple reason that any error flowing from them had no effect on the outcome of the trial … . Accordingly, we find that Courtright has failed to establish that the instructions were plainly erroneous."). Finally, even if we were to find (which we do not) that the district court committed plain error which affected Campbell's substantial rights, we would decline to reverse the harboring convictions because, viewing the record as a whole, we do not find that any error seriously affected the fairness, integrity or

public reputation of judicial proceedings. *See Olano*, 507 U.S. at 732.

### III.   Extortion

Campbell also challenges his conviction for extortion of Masha in violation of the Hobbs Act, 18 U.S.C. § 1951(a). Campbell's sole contention related to his Hobbs Act conviction is that the evidence at trial was insufficient to establish the required nexus between the extortion and interstate commerce. Because Campbell properly preserved this issue for appeal, "[w]e will overturn [the] jury verdict for insufficiency of the evidence only if, after viewing the evidence in the light most favorable to the government, the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt." *Aslan*, 644 F.3d at 540. Although this standard is not as difficult to meet as the plain error standard discussed above, it is nonetheless "highly deferential towards the decision reached at trial." *United States v. Mitov*, 460 F.3d 901, 907 (7th Cir. 2006).

The Hobbs Act imposes criminal liability on "[w]hoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by … extortion or attempts or conspires so to do." 18 U.S.C. § 1951(a). The Government had the burden of proving not only extortion (the evidence of which Campbell does not dispute), but "the extortion must be shown to affect interstate commerce." *Mitov*, 460 F.3d at 907. Because "the Hobbs Act is imbued with the full reach of Congress's Commerce Clause power," the Government "need only demonstrate a *de minimis* affect on commerce." *Id*. at 908 (citing *United States v. Re*, 401 F.3d 828, 834–35 (7th Cir. 2005)). "Moreover, the impact on commerce need not be actual; given that the

Hobbs Act criminalizes attempts as well as completed crimes, it is enough that the conduct (here, the conspiracy to extort) had the potential to impact commerce." *Re*, 401 F.3d at 835. The Hobbs Act proscribes "threatened or potential effects [on interstate commerce] which never materialize because extortionate demands are met." *United States v. Mattson*, 671 F.2d 1020, 1024 (7th Cir. 1982).

The jury heard the following evidence in this case. Campbell extorted money from Masha by threatening to mail an embarrassing video to Masha's parents in Belarus, upload the same video to the internet, and have Masha deported. Campbell believed at least some of the money Masha used to pay his extortionate demands was sent to Masha from her parents in Belarus.[7] Campbell twice directed Diamond to call Masha's parents in Belarus to obtain Masha's new phone numbers, enabling Campbell to continue perpetrating his extortionate scheme. Finally, Campbell attempted to extort free labor from Masha in the Day and Night Spa, a business engaged in interstate commerce.[8]

---

[7] Campbell contends that his beliefs should be irrelevant in the interstate-commerce analysis. However, we have held that a defendant's "belief provides the requisite interstate effect" under the Hobbs Act when the defendant's belief regarding "the interstate dealings of his specific target" impacted the defendant's overall plan. *United States v. Muratovic*, 719 F.3d 809, 814–15 (7th Cir. 2013); *cf. United States v. Bailey*, 227 F.3d 792, 798–99 (7th Cir. 2000) (holding that an attempt to rob FBI agents of money that the defendant erroneously believed came from a drug organization in interstate commerce satisfied the Hobbs Act interstate-commerce element).

[8] The Government presented evidence that the Day and Night Spa advertised online, purchased supplies and promotional materials from out-

We need not decide whether any one piece of evidence summarized above is alone sufficient to establish the required nexus between the extortion and interstate commerce. It is enough for us to hold—as we do—that the above evidence is, in combination and viewed in the light most favorable to the Government, sufficient for a reasonable jury to find that the interstate commerce element was satisfied by showing a direct connection between the extortion and interstate commerce and/or a "threatened … effect[] which never materialize[d] because [the] extortionate demands [were] met." *Mattson*, 671 F.2d at 1024; *see Mitov*, 460 F.3d at 909 ("The payment from Steven … was to be wired to Mitov's cousin in Luxembourg … . An international transfer of assets such as … this is sufficient to satisfy the interstate commerce requirement of § 1951.") (citing *United States v. Kaplan*, 171 F.3d 1351, 1355 (11th Cir. 1999)); *see also United States v. Horne*, 474 F.3d 1004, 1006 (7th Cir. 2007) (holding that the interstate commerce element of the Hobbs Act was satisfied by a defendant's use of an internet auction website to lure his victims to him, and "the government thus had no need to argue that the … victims … traveled from other states, and that they carried their money across state lines," because "the online auction site … is an avenue of interstate commerce, like an interstate highway or long-distance telephone

of-state, ordered satellite television, internet and telephone service from out-of-state companies, and employed workers from out-of-state. *See United States v. Clausen*, 328 F.3d 708, 712 (3d Cir. 2003) (stating that "good example[s] of a commercial establishment 'in' interstate commerce" for the purposes of the Hobbs Act are spas which, *inter alia*, advertised in newspapers and on the internet, had employees from out-of-state, and purchased supplies and equipment from out-of-state).

service"); *United States v. Atcheson*, 94 F.3d 1237, 1243 (9th Cir. 1996) ("McGrath and Atcheson's placement of out-of-state phone calls to determine the victims' account balances and credit card limits created a … connection with interstate commerce [pursuant to the Hobbs Act].") (citing *United States v. Lee*, 818 F.2d 302, 305–06 (4th Cir. 1987)).

Campbell contends that the interstate commerce element of the Hobbs Act may only be proven by evidence that the extortion affected the *victim's* interstate actions. Although such proof has been held to be sufficient, we have never held that it is the exclusive method by which the interstate commerce element may be proven. Our cases discuss two methods by which the interstate commerce element may be proven in Hobbs Act prosecutions: (1) "a direct connection between extortion and interstate commerce," and (2) a "depletion-of-assets indirect effect on interstate commerce." *Mattson*, 671 F.2d at 1023, 1024. Under a depletion-of-assets indirect effect theory, the focus typically is on whether the extortion affected the *victim's* interstate activities. *See id*. at 1024 ("Under the depletion of assets theory, commerce is affected when an enterprise, which either is actively engaged in interstate commerce or customarily purchases items in interstate commerce, has its assets depleted through extortion, thereby curtailing the victim's potential as a purchaser of such goods.") (quotation and emphasis omitted). However, the Government in this case did not rely on a depletion of assets theory. Instead, the Government sought only to prove a *direct* connection between the extortion and interstate commerce, and in such cases, "jurisdiction … is satisfied by showing a realistic probability that an extortionate *transaction* will have some effect on interstate commerce." *United States v. Staszcuk*, 517 F.2d 53, 60 (7th Cir. 1975) (en banc)

(emphasis added). As discussed above, the Government produced sufficient evidence for a reasonable jury to find that Campbell's extortion of Masha had a direct effect on interstate commerce and/or a threatened effect which never materialized because Masha met Campbell's extortionate demands.

### IV.    Sex Trafficking

Lastly, Campbell challenges his conviction for sex trafficking in violation of the Trafficking Victim's Protection Act ("TVPA"), 18 U.S.C. § 1591(a). Campbell contends that the Government's evidence was insufficient to establish the required nexus between Campbell's activities in interstate commerce and the commercial sex acts related to Diamond. Campbell argues that the Government showed only a link between interstate commerce and Campbell's lawful activities at the Day the Night Spa—which the parties agree was operated as a "clean" spa, that is, with no prostitution. In reviewing Campbell's challenge, we will overturn the jury verdict for insufficiency of the evidence only if, after viewing the evidence in the light most favorable to the government, the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt. *Aslan*, 644 F.3d at 540.

The TVPA, which was enacted in 2000, imposes criminal liability on "[w]hoever knowingly … in or affecting interstate or foreign commerce, … recruits, entices, harbors, transports, provides, obtains, or maintains by any means a person" (or benefits financially from participation in a venture which has engaged in such acts), "knowing, or in reckless disregard of the fact, that means of force, threats of force, coercion …, or any combination of such means will be

used to cause the person to engage in a commercial sex act." 18 U.S.C. § 1591(a). We have considered the TVPA only twice previously. *See United States v. Sawyer*, 733 F.3d 228 (7th Cir. 2013); *United States v. Cephus*, 684 F.3d 703 (7th Cir. 2012). In the only occasion we have had to consider the interstate commerce element of the TVPA, we held that the interstate commerce element has no *mens rea* requirement. *See Sawyer*, 733 F.3d at 229. In so holding, we stated: "[W]e can think of no reason Congress would have gutted the law by limiting prosecutions to the surely trifling number of sex traffickers who know, for example, that using a hotel room or out-of-state condoms affects interstate commerce as that term is understood in constitutional law." *Id.* at 230. Other circuits have interpreted the interstate commerce element of the TVPA expansively. *See United States v. Phea*, 755 F.3d 255, 263 (5th Cir. 2014) (holding interstate commerce element satisfied by evidence of the use of a mobile phone, advertisement for prostitution services on the internet, and a customer from out-of-state); *United States v. Todd*, 627 F.3d 329, 331, 333 (9th Cir. 2010) (holding interstate commerce element satisfied by evidence of advertisements in Craigslist and Seattle Weekly); *United States v. Evans*, 476 F.3d 1176, 1179–80 (11th Cir. 2007) ("Evans's enticement of Jane Doe to commit prostitution, even though his actions occurred solely in Florida, had the capacity when considered in the aggregate with similar conduct by others, to frustrate Congress's broader regulation of interstate and foreign economic activity … . Evans's use of hotels that served interstate travelers and distribution of condoms that traveled in interstate commerce are further evidence that Evans's conduct substantially affected interstate commerce.").

The Government presented evidence that Diamond placed advertisements for Elle Spa and Club Tan—where Diamond was forced to live and perform prostitution—on the internet website, Craigslist,[9] and the publication, Chicago After Dark, at Campbell's direction and for Campbell's financial benefit. The Government also presented evidence that Campbell and Diamond used mobile phones extensively in conducting the prostitution activities. It is not necessary for us to decide whether this evidence of internet and mobile phone usage is alone sufficient to satisfy the interstate commerce element of the TVPA, although at least one court has held that such evidence is. *See Todd*, 627 F.3d at 331, 333; *cf. Phea*, 755 F.3d at 263 (holding interstate commerce element of the TVPA was satisfied by evidence of the use of a mobile phone, internet advertisements, and an out-of-state customer); *Horne*, 474 F.3d at 1006 (holding interstate commerce element of Hobbs Act was satisfied by defendant's use of an internet auction website).

As noted above, the Government presented evidence that the Day and Night Spa advertised online, purchased supplies and promotional materials from out-of-state, ordered satellite television, internet and telephone service from out-of-state companies, and employed workers from out-of-state. *Cf. Clausen*, 328 F.3d at 712 (stating that a similar spa is a "good example of a commercial establishment 'in' interstate commerce" for the purposes of the Hobbs Act). Although Campbell operated the Day and Night Spa as a

---

[9] The Government presented evidence that Craigslist is headquartered in California.

"clean" spa where prostitution did not occur, the jury could reasonably find that the Day and Night Spa was an integral part of Campbell's overall massage and prostitution business, which encompassed several related spas. The jury could reasonably find that the Day and Night Spa provided a cover for the money Campbell received illicitly through prostitution, and a source of legitimate masseuses Campbell could use when he feared law enforcement was investigating the other spas. The jury also could reasonably find that Campbell used the Day and Night Spa as a recruitment tool for convincing prospective Family members that they would not be required to perform "extras", and instead would perform massages in a prostitution-free workplace. We find that, viewing the evidence in the light most favorable to the Government, all of the above evidence, in combination, is sufficient to satisfy the interstate commerce element of the TVPA.

## V.    Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court.