In the

# United States Court of Appeals

## For the Seventh Circuit

No. 05-2275

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MILKO MITOV,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 02 CR 723—**Harry D. Leinenweber**, *Judge.*

ARGUED FEBRUARY 9, 2006—DECIDED AUGUST 21, 2006

Before BAUER, EASTERBROOK, and WOOD, *Circuit Judges.*

BAUER, *Circuit Judge.* Because of actions stemming from
Milko Mitov's mistaken belief that "everybody takes money
in the United States," a jury convicted him of attempted
extortion under the Hobbs Act, 18 U.S.C. § 1951. On appeal,
he attacks the form of his indictment, evidentiary decisions
made by the trial court, the sufficiency of the evidence
leading to his conviction, and his sentence. We affirm.

## I. Background

In late 2000, Jay Berlinsky was contacted by Steven Japp,
an executive with a corporate client, the family-owned Jays
Potato Chip Company, on a personal legal matter. Steven

was concerned about the estate of his recently deceased grandfather, Leonard Japp, Sr. Leonard had died in August 2000 at the age of 96, and he left his entire estate to his third wife, Janice. This distribution was contrary to Steven's expectations, and he and his relatives suspected undue influence on the part of the beneficiaries. Because Berlinsky, an attorney with the law firm of Schwartz, Cooper, Greenberger, and Krauss,[1] represented the company in their corporate legal affairs, he referred the case to his partner, Richard Schultz. Schultz specialized in the litigation of such matters, and he agreed to represent Steven and his relatives.

When Schultz was conducting his initial research on the matter, the Japp family put him in touch with Milko Mitov. Mitov had worked as Leonard's caretaker in the Japp household from November 1998 to January 2000. During that time he was in close contact with the elderly patriarch.

On January 4, 2001, Schultz and his associate Brad Springer met with Mitov at his then current workplace in a suburb of Milwaukee, Wisconsin. During the course of the interview Schultz and Mitov discussed what Mitov had observed in the Japp household during his fifteen months of employment. The meeting was conducted in English, and the men had little trouble understanding each other. Springer took notes during the course of the discussion. At the conclusion of the meeting, Schultz believed Mitov was an important witness in the case for undue influence.

In February 2001, Schultz filed a civil complaint in DuPage County Circuit Court on behalf of Steven Japp, and members of his family, contesting certain amendments made to the structure of Leonard Japp, Sr.'s estate. The complaint was based in large part on the information

---

[1]   Hereinafter referred to as "Schwartz, Cooper."

provided by Mitov. In anticipation of the legal proceeding to follow, Schultz notified Mitov that he and other attorneys would likely contact him again in the coming months.

Over the course of the next year, however, obtaining Mitov's testimony became a major issue in the civil suit. On June 26, 2001, Schultz and Mitov met at the office of Schwartz, Cooper to discuss the deposition schedule. But Mitov had a different agenda. Schultz testified that Mitov demanded $100,000, tax-free, in exchange for his testimony in the civil suit. The payment was to be made in five to ten days to a Bulgarian radio station identified specifically by a pamphlet that Mitov brought to the meeting. He threatened that, should the payment not be made, he would forget his testimony and pretend to be unable to speak English at his deposition. Schultz rejected the proposition and asked Mitov if he was joking. He was not. Schultz then informed him that to pay for his testimony would be a crime, and that "[w]e don't do that in the United States." Trial Tr. vol. 1, 41, June 8, 2004. Mitov disagreed: "Don't tell me how things are done in the United States. Everybody takes money in the United States." *Id.*

Schultz testified that he repeatedly attempted to dissuade Mitov from this demand. But Mitov told Schultz that the Japps stood to profit from the suit and that his testimony was going to help them do that. The payment was in exchange for this help. Mitov then informed Schultz that should he not be paid, he would take a job in Texas where Schultz would never find him. Mitov closed his remarks by noting: "I'm not going to change my mind. You're going to pay me the $100,000 or you're not going to get my testimony." Trial Tr. vol. 1, 42, June 8, 2004. At the close of this, and each subsequent meeting with Mitov, Schultz made a memo recording the substance of the conversation.

Schultz further testified that over the course of the next three months Mitov reiterated his demand for pay-

ment. On July 10, 2001, Mitov phoned Schultz and asked if he was going to pay the $100,000. This time Mitov set the deadline for 5 p.m. that day. Schultz again refused, and took the opportunity to remind him that what he was doing was wrong; that it was a crime. Additionally, he asked Mitov to meet with him again at his office so that they could discuss the consequences of the demand. Mitov told Schultz he would consider the meeting, and asked Schultz to call him the next day. When Schultz made the call on July 12, however, Mitov again demanded payment. At the end of the conversation, Schultz convinced Mitov to meet in person again.

On Friday, July 13, 2001, Schultz and Berlinsky met with Mitov in person in an attempt to change his mind. Schultz testified that he told Mitov it was illegal to demand payment for his testimony, that doing so was ". . . extortion. It's a criminal violation." Trial Rec. vol. 1, 47, June 8, 2004. Their actions were to no avail: Mitov responded by raising his demand. He told them he wanted $100,000 before *and* another $100,000 after the trial. Again, he told them the first payment should be made to the Bulgarian radio station. During this meeting Mitov also told them that he was afraid of Eric Koenig, Janice Japp's son-in-law. Schultz told him that if he was afraid they should contact the authorities to obtain protection. At the close of the discussion Schultz handed Mitov his deposition subpoena with the date set for August 14, 2001.

Schultz testified that Mitov came to see him again on July 18, 2001, and the meeting followed a familiar arc. Initially Mitov told Schultz he would testify truthfully, but then added he would do so only in exchange for payment. Additionally, Schultz testified Mitov told him the Japp family had already paid him $300 for information and loaned him money to purchase a car during his term of employment. Lastly, Mitov claimed that Schultz had

already promised to pay him the $100,000, a claim which Schultz denied.

After repeatedly meeting with Schultz, Mitov turned his attention to Berlinsky. The two men met twice, first on August 6, and again on August 8, 2001. Berlinksy testified that over the course of the meetings he tried to convince Mitov to testify without payment, and Mitov attempted to persuade him to come up with the money. Neither men were successful in their endeavor. Mitov did not attend his scheduled deposition on August 14, 2001, and his deposition was never taken.

After Mitov failed to attend his deposition, Schultz doubted the possibility of succeeding in the Japp estate dispute. He testified that the complaint relied heavily on information Mitov provided in the January meeting, and that even if Mitov were to testify at a later date, he would have had to notify opposing counsel of the demand for payment. Schultz stated that "[t]he clients had brought to us an undue influence case, which I thought was a very viable case and it just disintegrated in our hands and the clients were not going to achieve the kind of success they were entitled to, in my opinion." Trial Tr. vol. 1, 55, June 8, 2004. When asked why he chose not to compel Mitov's testimony, Schultz replied that, strategically, there would have been no point: "Mr. Mitov told us he wasn't going to tell the truth[,] and pretend he couldn't understand English but, in addition to that, by this time, no matter what he said, he had destroyed his own credibility . . . once you are selling your testimony, [you are] not a credible witness." Trial Tr. vol. 1, 56-57, June 8, 2004.

Schultz contacted the United State's Attorney's Office concerning the matter shortly after the aborted deposition. On September 10, 2001, Schultz and Berlinsky met with Assistant United States Attorney Madeleine Murphy and Special Agent Tina Fourkas of the Federal Bureau of

Investigation (FBI) and reported Mitov's demands. Agent Fourkas then contacted Steven Japp, who agreed to assist the FBI in investigating the matter.

On January 15, 2002, Steven phoned Mitov and arranged to meet him the next day at a restaurant. This phone call and three subsequent conversations between Steven and Mitov were all recorded by Agent Fourkas. At the restaurant, Steven asked Mitov to attend the deposition. Mitov told him that would be deposed only if he was paid. He demanded the payment be wired to his cousin in Luxembourg: "I got a cousin, he's a very big doctor in Luxembourg . . . send money there, nobody knows about the money, nothing . . . Two hundred thousand. Two hundred thousand dollars." Trial Tr. vol. 2, 174, June 9, 2004. In a follow-up conversation on May 30, 2002, Steven asked Mitov what would happen if he didn't pay; Mitov responded: "I got information that you say goodby [sic] to. What about that?" Trial Tr. vol. 2, 183, June 9, 2004.

On July 24, 2002, a grand jury returned an indictment charging Mitov with three counts of attempted extortion in violation of the Hobbs Act, 18 U.S.C. § 1951.

In the weeks before the criminal trial, Schwartz, Cooper settled the Japp estate dispute. Schultz testified that Steven Japp was unhappy with the result, and that he was concerned about the impact of the loss on his reputation in the legal community. Additionally, because the case did not proceed properly, the firm was forced to discount their fees: "When a case goes bad like this one did, we discount everything, including expenses." Trial Tr. vol. 1, 70, June 8, 2004. Following the settlement, Schwartz, Cooper produced their notes and documentation pertaining to the civil suit. This material had previously been withheld pursuant to a claim of work-product privilege.

In his defense, Mitov stated that he demanded payment for his testimony because members of the Japp family had

previously promised to pay him for the information. He testified to conveying this promise to Schultz when they first spoke on the phone in January 2001, and again to Springer at the close of their January 4 meeting. Both men, he stated, agreed to pay him. But Mitov acknowledged that when he visited Schultz in his office, Schultz denied having agreed to pay him. He further testified that Schultz told him that paying for his testimony was illegal, and that he understood that if something was illegal it was "against the law." Trial Tr. vol. 2, 233, June 9, 2004. On cross-examination, Mitov admitted to directing Steven Japp to send $200,000 to his cousin in Luxembourg. Mitov also testified that he sought the money out of fear of Eric Koenig, and that he would have used the money to ensure his own protection.

On June 10, 2004, the jury found Mitov guilty as charged in all three counts of the indictment. On appeal, Mitov argues that (1) the district court constructively amended the indictment, (2) the government failed to prove elements of the crime as charged, (3) the district court erred in not admitting additional evidence from the underlying civil case, and (4) that the findings made at his sentencing were contrary to *United States v. Booker*, 543 U.S. 220 (2005).

## II. Analysis

### A. The Indictment

Mitov first claims that the district court erred in granting the government's motion to amend the date on count one of the indictment. He argues that the date change violated his Fifth Amendment right to be tried on indictments brought by a grand jury. U.S. CONST. amend. V. A constructive amendment to an indictment "'occurs when either the government . . . , the court . . . , or both, broadens the possible bases for conviction beyond those presented by the grand jury.'" *United States v. Cusimano*, 148 F.3d 824, 829

(7th Cir. 1998) (citing *United States v. Floresca*, 38 F.3d 706, 710 (4th Cir. 1994)). Whether the change allowed at trial amounted to an impermissible constructive amendment is a question of law that we review *de novo*. *United States v. Trennell*, 290 F.3d 881, 886 (7th Cir. 2002); *see also United States v. Alhalabi*, 443 F.3d 605, 614 (7th Cir. 2006).

Count one of the indictment charged that:

> On or about June 1, 2001, . . . MILKO MITOV . . . knowingly attempted to affect commerce by extortion, in that defendant attempted to obtain property in the form of payments from attorneys of Schwartz, Cooper, Greenberger and Krauss, whose consent defendant attempted to induce by the wrongful use of actual and threatened fear of economic harm."

R.1. The June 1, 2001, date was erroneously noted by Agent Fourkas in her September 10, 2001, meeting with Schultz and Berlinsky. The government did not learn of the error until, in the days before trial, the attorneys of Schwartz, Cooper turned over their notes from the underlying civil suit. In reviewing the notes, the government realized that the meeting between Mitov, Schultz and Berlinsky, in which Mitov first made his demand in person, actually occurred on July 13, 2001. On June 7, 2004, the day before Mitov's trial began, the government moved to amend the indictment and correct the error. Before granting the motion, the district court asked Mitov if he would suffer any prejudice from this change. Defense counsel responded only by noting generally that their case had been "based on the indictment as it was written." Trial Tr. vol. 1, 2-3, June 8, 2004. At no point during the trial did Mitov raise a defense that went to the date or timing of the criminal demand.

For a change in the indictment to rise to the level of a constructive amendment, it must establish an offense different from, or in addition to, those originally charged. *See Trennell*, 290 F.3d at 888. As such, we are primarily

concerned with changes made to the indictment that affect elements of the crime. *United States v. Krilich*, 159 F.3d 1020, 1027 (7th Cir. 1998). In a charge of extortion, however, the date is not an element of the offense. *See id.*; 18 U.S.C. § 1951. Further, where the charge is worded so broadly as to state "'on or about' a certain date, the defendant is deemed to be on notice that the charge is not limited to a specific date." *United States v. Folks*, 236 F.3d 384, 391 (7th Cir. 2001) (citing *United States v. Leibowitz*, 857 F.2d 373, 379 (7th Cir. 1988)). Given the broad wording of count one as offered by the grand jury, and the fact that the changed date fell before the date of the indictment itself and within the statute of limitations, we find that the district court did not err in granting the government's motion. *See id.*

## B.  The Conviction

Mitov next argues that the evidence presented at trial was insufficient to convict him of attempted extortion, despite the jury's verdict. Our review of such a claim is highly deferential towards the decision reached at trial, and we may reverse the conviction "'only when the record is devoid of any evidence, regardless of how it is weighed, from which a jury could find guilt beyond a reasonable doubt.'" *United States v. Gracia*, 272 F.3d 866, 873 (7th Cir. 2001) (citing *United States v. Garcia*, 35 F.3d 1125, 1128 (7th Cir. 1994)). As if this hurdle was not high enough, Mitov failed to raise these challenges before the district court, and so we review only for plain error. *United States v. Cummings*, 395 F.3d 392, 397 (7th Cir. 2005). Mitov, therefore, must demonstrate a manifest miscarriage of justice. *United States v. Meadows*, 91 F.3d 851, 854-55 (7th Cir. 1996).

To support the conviction of attempted extortion under 18 U.S.C. § 1951, the government had to prove, beyond a reasonable doubt, that Mitov wrongfully used force or fear,

including fear of economic harm, to obtain money or property, with their consent, from Schwartz, Cooper and Steven Japp. § 1951(b)(2); *see also United States v. Granados*, 142 F.3d 1016, 1019-20 (7th Cir. 1998). This fear of economic harm need not be certain, it must only be reasonable. *Granados*, 142 F.3d at 1020. Additionally, the extortion must be shown to affect interstate commerce. § 1951(a). Mitov contends that the government failed to show both that the victims' fear was reasonable and that the attempted extortion affected commerce.

Mitov's primary claim regarding the reasonableness of the victims' fear of economic harm is that the underlying state suit was destined to fail. Therefore, any hope of success and possible economic profit was unreasonable. But this argument demands a showing of certainty of success in the underlying suit, not reasonableness, and thus goes farther than the statute requires. In the instant case, if the victims had a reasonable belief in some form of success and profit from the civil suit, a threat to that profit may create a reasonable fear of economic harm. Concurrently, in the State of Illinois, a will containing an attestation clause disclosing that all of the statutory requirements have been met, and evidencing admittedly genuine signatures, establishes a prima facie case favoring due execution of the will. *In re Estate of Chlebos*, 194 Ill. App. 3d 46, 50-51 (Ill. App. 1990). But this is a rebuttable presumption, and not every case challenging a will is certain to fail. *Id.*; *see In re Estate of Jacobson*, 75 Ill. App. 3d 102, 107 (Ill. App. 1979) (denying admission of will to probate where evidence demonstrating soundness of testator's mind was "patently insufficient"). A seasoned attorney such as Schultz may therefore be found by the jury to have had a reasonable chance of some form of success and profit, and thus a reasonable fear of harm upon hearing Mitov's demand.

At trial, the government used Schultz's testimony to prove the offense charged in count one, Mitov's attempted extor-

tion of Schwartz, Cooper. Schultz testified to his expectation of success in the underlying civil suit, the negative effect of Mitov's demand for payment on that suit, and his fear of repercussions within the legal community for the reputation of his firm. He stated that Steven Japp and members of his family brought him a "very viable case," based in large part on the information provided by Mitov in his January 4, 2001 interview. Trial Tr. vol. 1, 55, June 8, 2004. And while Schultz acknowledged there was no guarantee of success in the matter, his testimony was explicit in that he believed Mitov's demand for payment destroyed the witness's credibility, and thus the foundation of the case. The demand, Schultz stated, "significantly diminished" the firm's likelihood of success. *Id*. This diminished probability, and their resulting discount in fees and expenses created not just a reasonable fear of economic harm, but actual economic harm, sufficient to satisfy the elements of the Hobbs Act. *See United States v. Lewis*, 797 F.2d 358, 364 (7th Cir. 1986); *United States v. Rindone*, 631 F.2d 491, 494 (7th Cir. 1980).

As to counts two and three, which charged Mitov for the attempted extortion of Steven Japp in 2002, he argues that because his prior demand on the law firm had sabotaged the will challenge, it was impossible for Steven to expect any form of success in the case, and thus possess the requisite reasonable fear. Essentially, Mitov claims that the extortion of Steven Japp was factually impossible. But Mitov was convicted of *attempted* extortion, and factual impossibility is no defense. *United States v. Bailey*, 227 F.3d 792, 797 (7th Cir. 2000). Further, Steven Japp's reasonable fear of economic harm is intertwined with that of his attorney, Richard Schultz. Because Schultz was Steven's legal representative, any fear that Schultz had regarding the effect of the demand on the case, and thus the economic benefit from suit or settlement, may be imputed to Steven himself.

Mitov further claims that the government failed to demonstrate that his actions affected interstate commerce. But the Hobbs Act is imbued with the full reach of Congress's Commerce Clause power. 18 U.S.C. § 1951(b)(3); *Scheidler v. NOW, Inc.*, 537 U.S. 393, 408, (2003). Therefore, the government need only demonstrate a *de minimis* affect on commerce. *United States v. Re*, 401 F.3d 828, 834-35 (7th Cir. 2005). Or, where there is no actual effect, the government need prove only "a realistic probability of an effect . . . on interstate commerce to bring [the extortion]" within prosecutorial reach. *United States v. Peterson*, 236 F.3d 848, 852 (7th Cir. 2001) (citing *United States v. Bailey*, 227 F.3d 792, 797 (7th Cir. 2000)).

In his attack on count one, the attempted extortion of Schwartz, Cooper, Mitov argues that the money was supposed to come from the Japp family, not the firm, and thus would not have affected interstate commerce. But his demands for payment were never so specific as to the source of the funds, and he repeatedly gave short-term deadlines to raise the money. Had the firm satisfied these demands, their assets would have been temporarily depleted. Such a "loss of the use of money constitutes a deprivation of property under § 1951," *Lewis*, 797 F.2d at 365, and, because the firm regularly purchases items from states other than Illinois, interstate commerce would have been effected. *Bailey*, 227 F.3d at 797-98. The government, therefore, made the necessary showing as to count one.

On counts two and three, charging the attempted extortion of Steven Japp, Mitov argues that the demanded payment was to come from the family, and thus not affect interstate commerce. The payment from Steven, however, was to be wired to Mitov's cousin in Luxembourg; a fact he admitted at trial. An international transfer of assets such as is this is sufficient to satisfy the interstate commerce requirement of § 1951. *See United States v. Kaplan*, 171 F.3d 1351, 1355 (11th Cir. 1999). Given these eviden-

tiary showings on the form and probable consequences of Mitov's demands for payment, we cannot say that the record was devoid of evidence from which the jury could find he attempted to extort Schwartz, Cooper and Steven Japp.

### C. Evidence From the Underlying Civil Suit

Mitov next claims that the district court erred in limiting his use of evidence from the state court trial. We review these evidentiary rulings for an abuse of discretion, which will be found only where no reasonable person would agree with the decision of the district court. *United States v. Thomas*, 453 F.3d 838, 845 (7th Cir. 2006).

In arguing this point, Mitov generally claims that his culpability on the attempted extortion charge is "inseparable from the strength of the proof of undue influence" in the underlying state civil suit. Defendant's Br. 21. In presenting this theory at trial, he aimed to introduce Springer's notes from the January 4, 2001, meeting, answers to interrogatories verified by Steven Japp, and prior amendments made to Leonard Japp, Sr.'s trusts. His apparent intention was to re-try the civil suit in federal court. But the district court judge was not required to allow this, and to do so would have been an unjustifiable expense and delay. FED. R. EVID. 102. As noted above, 18 U.S.C. § 1951 does not require that the victim's fear be certain, it need only be reasonable. Further, Mitov was able to appropriately and extensively cross-examine Schultz on his expectations for the underlying case using the answers to interrogatories and the substance of Springer's notes. This line of questioning brought to light apparent inconsistencies between the two documents, and thus the reasonableness of Schultz's fear of harm. Notwithstanding Mitov's general citation to FED. R. EVID. 103, rulings on evidence, he presents nothing to indicate that no reasonable person would have agreed with the district court.

### D.  The Sentence

Lastly, Mitov argues that the district court committed error in finding, by a preponderance of the evidence, that he obstructed justice. This finding enhanced his Guideline Range by two levels pursuant to U.S.S.G. § 3C1.1. Mitov claims that *United States v. Booker*, 543 U.S. 220 (2005), held such enhancements must be found beyond a reasonable doubt. He is mistaken. *See United States v. Bryant*, 420 F.3d 652, 656 (7th Cir. 2005). Such a burden of proof is necessary only where the finding yields an imposed sentence greater than the statutory maximum. *Id*. Mitov, however, was sentenced to a term of twenty-four months, well below the statutory maximum of twenty years. 18 U.S.C. § 1951(a).

For the abovementioned reasons, the decisions of the district court and petitioner-appellant's conviction are AFFIRMED.

A true Copy:

     Teste:

 

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*