In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 15-2511 and 15-3106

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

PAWEL W. WROBEL and MAREK
STANISLAWCZYK,

*Defendants-Appellants.*

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 12 CR 650 — **Rebecca R. Pallmeyer**, *Judge.*

ARGUED SEPTEMBER 20, 2016 — DECIDED OCTOBER 28, 2016

Before BAUER, POSNER, and EASTERBROOK, *Circuit Judges.*

BAUER, *Circuit Judge.* On August 14, 2012, Slawomir Wieckowicz, a confidential informant, alerted FBI agents of a phone call he had with Zbigniew Oziemski, in which Oziemski solicited Wieckowicz's help in planned robberies that were to occur in New York. Wieckowicz told the FBI agents of Oziemski's plan to travel from Poland to New York, and then

to Chicago. In Chicago, Oziemski would meet with Marek Stanislawczyk, and then they would travel to New York to commit the robberies.

On August 15, 2012, Wieckowicz told agents that Stanislawczyk was in New York, but he would return to Chicago and then travel from Chicago to New York with Oziemski and a third person (later identified as Pawel Wladyslaw Wrobel) to commit the robberies. Stanislawczyk detailed Oziemski's travel plans to Wieckowicz, and explained that they would travel all together from Chicago to New York. Stanislawczyk asked Wieckowicz to rent a van under a false name.

On August 16, 2012, Wieckowicz, Wrobel, and Stanislawczyk met at Stanislawczyk's apartment in Elk Grove Village, Illinois. Oziemski participated via Skype. Wieckowicz recorded the conversations. During this meeting, Wrobel and Stanislawczyk told Wieckowicz that they would travel to New York with Oziemski to rob a particular individual, Jacob Reichman, a diamond merchant, at his residence in Brooklyn, New York. Wrobel said that Reichman would be so frightened that he would "turn [the diamonds] over just like that. Those people are fucking scared … you won't fucking have to do anything to him. He'll just turn it over by himself and that's it." Stanislawczyk described how a van would be most preferable and efficient for conducting the robbery: "We drive up, the doors are open; we throw the Jew [*i.e.,* the diamond merchant] inside … we take the diamonds, the easiest job. He has the diamonds on him … . [H]e has it on him, and we fucking taking it."

Assuming a successful robbery, Wrobel and Stanislawczyk expected to sell the stolen diamonds to an individual Wrobel knew as "Alex," purportedly a former business partner of Reichman. They predicted that the robbery would net between one to three million dollars.

On August 18, 2012, Oziemski, Stanislawczyk, Wrobel, and Wieckowicz met at Stanislawczyk's apartment again. Wieckowicz again recorded the conversations. Wrobel informed the others that Reichman was an Orthodox Jew in his late sixties who supplied diamonds to retail outlets. Stanislawczyk expressed confidence that Reichman was certain to be carrying gems of substantial value: "He has a minimum of two [million dollars' worth of diamonds] on his person … . He's the kind of Jew that receives a phone call that there's a need for a fucking so-and-so carat diamond in a color like this … and he fucking has it." Wrobel and Stanislawczyk had a specific address and displayed the location of Reichman's home on an iPad using Google Maps. They also described the area based on their observations from having visited the location the previous week. The group agreed to rent a van equipped with New York license plates to avoid unwanted attention from law enforcement.

Under the supervision of the FBI, Wieckowicz rented a van equipped with both New York license plates and a sliding door. The FBI also equipped the rental van with a recording device.

On August 20, 2012, Wrobel, Stanislawczyk, Oziemski, and Wieckowicz began their travel from Elk Grove Village to New York. Wrobel forgot "the bag with the tools … and gloves"

inside Stanislawczyk's apartment, so the group went back to the apartment. Stanislawczyk retrieved the bag containing a pry bar and three pairs of gloves.

On August 21, 2012, the group checked into a Comfort Inn near Linden, New Jersey, at approximately 6:30 a.m. Shortly thereafter, Stanislawczyk, Wrobel, and the two others (including the confidential informant) were arrested by the FBI. The FBI agents found hooded sweatshirts and a black hat in Wrobel and Stanislawczyk's luggage, brought for the purpose of disguising and concealing their identities. The FBI searched the rental van and found a shopping bag containing three pairs of gloves and a pry bar.

On November 6, 2012, Wrobel, Stanislawczyk, and Oziemski were charged in an indictment with conspiring to obstruct, delay, and affect commerce by robbery of diamonds and other valuables, in violation of the Hobbs Act, 18 U.S.C. § 1951(a) (Count 1); and, attempting to obstruct, delay, and affect commerce by robbery in violation of § 1951(a) (Count 2). On October 8, 2013, a Superseding Indictment added a third count, and extortion allegations to Counts 1 and 2. Prior to the case going to the jury, the government dismissed the extortion allegations from Counts 1 and 2, and Count 3 in its entirety.

Prior to trial, on October 17, 2013, the government gave notice of its intent to introduce expert testimony from Donald Strzepek regarding the diamond business. Strzepek would testify that all diamonds are mined outside the United States, and that diamond dealers frequently carry diamonds from place to place on their persons. The government sought to introduce Strzepek's testimony to establish a nexus between

the charged offense and interstate commerce, and also to rebut arguments that Wrobel, Stanislawcyzk, and Oziemski's statements regarding robbing a diamond merchant were mere fantasy. On October 22, 2013, Oziemski filed a motion *in limine* to suppress this testimony as irrelevant and prejudicial. The district court denied the motion, and subsequently overruled a similar objection at trial.

On November 8, 2013, the jury convicted Wrobel, Stanislawczyk, and Oziemski on two Hobbs Act counts. On July 15, 2015, the district court ruled on a "plethora" of motions for post-trial relief, including motions for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(c), and, alternatively, motions for a new trial. All post-trial motions for relief were denied.

On September 2, 2015, Stanislawczyk appeared *pro se* at his sentencing hearing having dismissed three separate appointed attorneys during the course of his case. At the beginning of the hearing, the district court warned Stanislawczyk of the disadvantages of refusing counsel and choosing to represent himself. After the government provided its argument to the court, the district court spoke directly to Stanislawczyk, stating: "Mr. Stanislawczyk, you are welcome to make a statement as well before your sentence is imposed." Stanislawczyk covered a variety of topics while exercising his right of allocution.

On July 6, 2015, the district court sentenced Wrobel to 60 months' imprisonment on each of his two convictions, the sentences to run concurrently. On September 2, 2015, the district court sentenced Stanislawczyk to 61 months'

imprisonment on the two counts, the sentences to run concurrently. Wrobel and Stanislawczyk timely appealed.

Wrobel and Stanislawczyk claim that there was insufficient evidence to establish the required nexus between the crime and interstate commerce under the Hobbs Act, 18 U.S.C. § 1951(a); they also argued that the district court improperly admitted testimony by the government's expert witness. And last, Stanislawczyk argues that the district court failed to provide him an adequate opportunity for allocution.

**A.  The Sufficiency of the Evidence**

We will overturn a jury's verdict only if, "after viewing the evidence in the light most favorable to the government, the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt." *United States v. Campbell*, 770 F.3d 556, 571–72 (7th Cir. 2014) (citation omitted). Since Wrobel and Stanislawczyk failed to properly raise this challenge before the district court, we review for plain error only. *United States v. Mitov*, 460 F.3d 901, 907 (7th Cir. 2006). As a result, Wrobel and Stanislawczyk can only obtain a reversal if they demonstrate a "manifest miscarriage of justice." *Id*. Regardless, Wrobel and Stanislawczyk's challenge fails under either standard.

The Hobbs Act makes it a crime for a person to "obstruct[], delay[], or affect[] commerce or the movement of any article or commodity in commerce, by robbery … or attempt[] or conspire[] so to do … ." 18 U.S.C. § 1951(a). Because the Hobbs Act also criminalizes attempts, the government does not need to prove that the defendant's actions actually affected interstate commerce, but "only that there exists a 'realistic

probability' of an effect on commerce." *United States v. Bailey*, 227 F.3d 792, 797 (7th Cir. 2000) (citation omitted). To prove an attempt, the government must have shown only that Wrobel and Stanislawczyk acted with specific intent to commit the underlying offense, and took a substantial step towards its completion. *See id.*

The jury heard the following evidence: Wrobel and Stanislawczyk traveled across state lines for the purpose of robbing diamonds from a diamond merchant whose diamonds were invariably obtained via foreign commerce, *i.e.*, "commerce between any point in a State … and any point outside thereof … ." 18 U.S.C. § 1951(b)(3). While Wrobel and Stanislawczyk objected to testimony of the government's expert witness, they did not—and still do not—challenge the expert's claim that diamonds are not mined in the United States.[1] The market for diamonds in the United States implicates foreign commerce. Thus, Wrobel and Stanislawczyk's conspiracy and attempted robbery of a diamond merchant had a "realistic probability" of an effect on interstate commerce.

Moreover, the government was able to show an effect on interstate commerce under the "depletion of assets" theory. Under this theory, "commerce is affected when an enterprise, which either is actively engaged in interstate commerce or customarily purchases items in interstate commerce, has its assets depleted through [robbery], thereby curtailing the victim's potential as a purchaser of such goods." *United States*

---

[1] At oral argument, defense counsel admitted that "zero" diamonds were mined in the United States, and stated: "We are not disputing that a diamond merchant is interstate commerce."

*v. Harty*, 930 F.2d 1257, 1261 (7th Cir. 1991) (alteration in original) (quoting *United States v. Elders*, 569 F.2d 1020, 1025 (7th Cir. 1978); *accord United States v. Muratovic*, 719 F.3d 809, 813 (7th Cir. 2013).

Wrobel and Stanislawczyk planned and intended to rob Reichman because they believed he was a diamond merchant with an abundant supply of diamonds. Wrobel and Stanislawczyk's belief that Reichman was actively engaged in the business of buying and selling diamonds is evidenced, among other things, by hours of recorded conversations. For example, Stanislawczyk stated: "[Reichman] has a minimum of two [million dollars' worth of diamonds] on his person … . He's the kind of Jew that receives a phone call that there's a need for a fucking so-and-so carat diamond in a color like this … and he fucking has it." Wrobel and Stanislawczyk's intent to sell the stolen diamonds to Reichman's former business partner also evidences their belief that Reichman conducted himself in some form of a business entity. Had the robbery occurred as planned, Wrobel and Stanislawczyk would have not only depleted the diamond merchant's assets, but also curtailed the diamond merchant's potential as purchaser and seller of diamonds having moved through interstate commerce. Therefore, the government provided sufficient evidence for a reasonable jury to find that the interstate commerce element was satisfied under the "depletion of assets" theory.

In response, Wrobel and Stanislawczyk's main argument largely relies on this court's decision in *United States v. Mattson*, 671 F.2d 1020 (7th Cir. 1982). They argue that the attempted robbery could not have affected interstate commerce because the government failed to present evidence that Reichman was

actually engaged in conducting business as a diamond merchant at the time of the offense. They contend that had they successfully robbed Reichman, they would have only robbed an individual, which would not have affected interstate commerce.

Wrobel and Stanislawczyk's reliance on *Mattson* is misplaced. They believe that *Mattson* precludes us from finding that the government satisfied the interstate commerce element because Reichman, like the victim in *Mattson*, is an individual not engaged in interstate commerce. This argument overlooks a crucial distinction based on well-established law. Unlike the extortion conviction reversed in *Mattson*, Wrobel and Stanislawczyk's convictions were for an *attempted* Hobbs Act robbery. Factual impossibility and mistake of fact are not defenses to an attempt crime. *Mitov*, 460 F.3d at 908 (citing *Bailey*, 227 F.3d at 797); *Muratovic*, 719 F.3d at 814 (noting that the "inability to complete the crime 'does not diminish the sincerity of any efforts to accomplish that end'" (quoting *United States v. Cotts*, 14 F.3d 300, 307 (7th Cir. 1994))). It does not matter whether or not Reichman was actually a diamond merchant engaged in interstate commerce. What matters is that the evidence demonstrated that Wrobel and Stanislawczyk acted with the specific intent to rob a diamond merchant and took a substantial step toward robbing diamonds from someone whom they believed to be a diamond merchant. The government presented sufficient evidence to establish the required nexus between the offense and interstate commerce.

### B. Improperly Admitted Evidence

Wrobel and Stanislawczyk do not object to Strzepek's qualifications as an expert, nor do they contend that the district court improperly applied the Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), analysis. Instead, Wrobel and Stanislawczyk argue that the district court abused its discretion by admitting Strzepek's expert testimony because it was not relevant under Federal Rule of Evidence 401; or, even if relevant, it was unfairly prejudicial under Federal Rule of Evidence 403.

Prior to trial, the government gave Wrobel and Stanis-lawczyk notice of its intent to introduce Strzepek's testimony regarding the diamond business. Strzepek, a certified gemo-logist with over thirty years of experience in the diamond industry, would testify that all diamonds are mined outside of the United States, and that diamond dealers frequently carry diamonds from place to place on their persons as a means of transportation. In response, the defendants argued that the testimony would be irrelevant and prejudicial. The district court disagreed and denied the motion. The district court overruled a similar objection at trial, and stated:

> First of all, that is the subject of expert testimony makes sense to me because—I mean, let's just use sort of a rough-and-ready test. Is this some-thing the average person knows? I'm an average person. I don't know how diamond dealers carry diamonds. I have never seen anything like this. It's completely unfamiliar to me.

> So somebody that has experience and exposure to the diamond-dealing practices would be someone who I would characterize as having specialized knowledge of this issue. And the other concern, that he obviously didn't see the victim wearing this vest or doesn't even know the victim, is all material that's subject to cross-examination.

> I think it does go to rebut the notion that it's fantastical to expect that a diamond dealer would leave his house carrying diamonds on his body. Again, this is something I am personally completely unfamiliar with. And I do think jurors may very well have no idea how this is done or whether it is indeed fantastical or not fantastical.

We find that the district court did not abuse its discretion in admitting this evidence, nor do we find the evidence unfairly prejudicial. We consider each argument in turn.

### 1. Relevance

In determining the materiality and relevancy of evidence, the district court has been accorded "wide discretion." *United States v. Hall*, 165 F.3d 1095, 1117 (7th Cir. 1999). Wrobel and Stanislawczyk contend that the district court abused its discretion by admitting Strzepek's testimony because it is not relevant. To support this argument, Wrobel and Stanislawczyk revert to similar claims that they made regarding the sufficiency of the evidence, and claims better fashioned as Rule 403 arguments. They argue that only an individual would have

been robbed, not a diamond merchant; and, that the government cannot establish the jurisdictional element "by using Strzepek's testimony because the defendants were not planning on robbing Strzepek." But, these claims do not address whether the evidence at issue is relevant or not.

Strzepek's testimony regarding his "specialized knowledge" of the diamond industry is relevant because it could assist the jury in understanding the evidence or in determining a fact at issue. Because diamonds are not mined in the United States, Strzepek's testimony is relevant to the interstate commerce element of the Hobbs Act.

In addition, Strzepek's testimony was also relevant as a rebuttal to Wrobel and Stanislawczyk's defense. Wrobel and Stanislawczyk claimed that they only spoke in fantastical terms, and therefore did not exhibit an actual intent to rob Reichman; Strzepek testified that diamond merchants frequently carried diamonds on their persons from place to place as a means of transporting diamonds. This testimony tended to show that Wrobel and Stanislawczyk reasonably believed Reichman would actually have millions of dollars' worth of diamonds on his person, and that this belief was reasonable.

The district court did not abuse its discretion in finding Strzepek's testimony relevant.

### 2. Prejudice Under Rule 403

Wrobel and Stanislawczyk contend that even if Strzepek's testimony was relevant, the district court should have excluded it because its probative value was substantially outweighed by its prejudicial effect.

Wrobel and Stanislawczyk assert that Strzepek's testimony created an impermissible inference that Reichman was a diamond merchant. But, Strzepek's testimony did not imply that Reichman was a diamond dealer, and the district court made sure of this. Prior to Strzepek's testimony, the district court made sure the government was "not going to suggest that [Strzepek] saw the victim wearing [a diamond merchant's vest or wallet] or anything of the kind." At trial, the government did not ask Strzepek if Reichman was a diamond dealer. In fact, Strzepek was asked this question and gave this answer in front of the jury:

> Q: It would be fair to say, wouldn't it, that you
>    don't know anything about the particular facts
>    of this particular case?
>
> A: No, I don't.

Strzepek's testimony was not intended to mislead the jury into believing Reichman was a diamond merchant. Instead, Strzepek's testimony was intended to support the government's position that Wrobel and Stanislawczyk actually believed that, as a person in the business of buying and selling diamonds, Reichman was likely to be in possession of diamonds, either on his person or at his home, and that their belief was reasonable.

Wrobel and Stanislawczyk argue that the district court did not balance the evidence's probative value against its prejudicial effect. However, the district court considered whether Strzepek's testimony had the potential to mislead the jury. To prevent this danger, the district court instructed the govern-

ment to ask Strzepek questions regarding his specialized knowledge only.

The district court did not abuse its discretion when admitting Strzepek's testimony.

### C.  Right of Allocution

Stanislawczyk separately contends that the district court did not adequately comply with Federal Rule of Criminal Procedure 32 and denied him his right of a meaningful allocution. Rule 32 provides that, "[b]efore imposing sentence, the court must … address the defendant personally in order to permit the defendant to speak or present any information to mitigate the sentence … ." Fed. R. Crim. P. 32(i)(4)(A)(ii). We recognize that the right of allocution is an important right that the district courts must construe liberally. *United States v. Covington*, 681 F.3d 908, 910 (7th Cir. 2012) (citing *United States v. Barnes*, 948 F.2d 325, 328–30 (7th Cir. 1991)). But, the right of allocution is not without limits. *United States v. Alden*, 527 F.3d 653, 663 (7th Cir. 2008) (collecting cases describing limits on the right to allocute). Rule 32 "does not purport to set out a script that the district courts must follow when advising defendants of their right to allocution." *United States v. Williams*, 258 F.3d 669, 674 (7th Cir. 2001). Instead, we look to the "substance of what occurred." *Id.*

In considering Stanislawczyk's arguments, we will follow the same analysis utilized by this Court in *Williams*. *See id.* at 674–75. First, the district court satisfied the first part of Rule 32 when it personally addressed Stanislawczyk—"Mr. Stanislawczyk, you are welcome to make a statement as well before your sentence is imposed." In *Williams*, we held that the district

court's question to the defendant—"Mr. Williams, is there anything you would like to say?"—satisfied Rule 32's requirement that the district court address the defendant personally. *Id.* at 675. The unambiguous manner in which the district court personally addressed the defendant in *Williams* is sufficiently similar to the way the district court addressed Stanislawczyk. The district court satisfied the requirement that it personally address Stanislawczyk.

Second, the district court permitted Stanislawczyk to speak or present any information to mitigate the sentence. Although we do not know the duration of Stanislawczyk's allocution, it extended for more than nine pages in the transcript. Stanislawczyk elected to use his allocution time to cover a vast array of topics, including: (1) inadequacies in the government's case; (2) ineffectiveness of his trial counsel; (3) the United States Constitution; and, (4) family problems in Europe. In concluding his allocution, Stanislawczyk stated that the "only thing [he] ask[s]" for is that "your Honor to use your gavel as a magic wand and kick me out of this county, make me return to my country to Poland." The record as a whole shows that the district court satisfied its obligation under Rule 32 and that Stanislawczyk's right to allocution was not denied.

Stanislawczyk's argument essentially requests us to adopt an expansive and unprecedented interpretation of Rule 32. Rule 32 provides the defendant two opportunities to persuade the court as to the appropriate sentence: once by the defendant's attorney, Rule 32(i)(4)(A)(i), and the other by the defendant, Rule 32(i)(4)(A)(ii). Stanislawczyk contends that when a defendant proceeds *pro se*, his inability to exercise his right to have an attorney speak on his behalf "penalize[s] a

*pro se* defendant." Stanislawczyk argues that the district court therefore has a duty to "clarify[] the two separate procedural rights" to a *pro se* defendant and explain to the *pro se* defendant of "his right to speak in mitigation."

This argument is flawed. Stanislawczyk erroneously believes that Rule 32 requires the district court to treat a defendant proceeding *pro se* as two separate entities: the defendant as the defendant's attorney, and the defendant as the defendant. Unsurprisingly, Stanislawczyk does not cite to any authority in support of this argument, and we do not believe any reasonable reading of Rule 32 would support it. Thus, when the district court personally addressed Stanislawczyk, it was only as a defendant. There was no error in this procedure.

Furthermore, Stanislawczyk cannot claim he was "penalize[d]" by not having an attorney at sentencing when he insisted on proceeding without counsel. When asked by the district court as to whether he would proceed without counsel, Stanislawczyk stated: "Yes. I would like your Honor to be done and over with, with this case today, yes."

Reviewing the sentencing transcript in its entirety, it reveals that the district court advised Stanislawczyk of the concerns and disadvantages in proceeding *pro se* pursuant to *Faretta*. 422 U.S. 806. The district court not only advised Stanislawczyk just before sentencing began, but had conducted an extensive colloquy in earlier proceedings. *See* March 9, 2015, Order. Stanislawczyk does not contend otherwise.

In a last attempt, Stanislawczyk argues that the record, consisting of over nine pages of transcript, shows that he did

not understand that his allocution time was meant to cover topics such as remorse or present arguments in mitigation. Stanislawczyk points out that this confusion is further high-lighted by the fact that he set out two arguments in mitigation —sentence disparity and criminal history—only after the district court had already imposed his sentence.

These claims are unpersuasive. First, the transcript shows that Stanislawczyk talked about remorse. In fact, Stanislawczyk claimed "[t]here is nobody [he] could apologize to," except to his family. Second, Stanislawczyk could not have offered an argument based on sentence disparity—as compared to his co-defendants' sentences—prior to the district court's imposition of his sentence. Stanislawczyk was the last of the three co-defendants to be sentenced, and he had the lowest sentencing Guidelines range.

The transcript shows that the district court gave Stanis-lawczyk what seemed like free-range to talk about whatever he pleased. The district court did not commit procedural error when it permitted Stanislawczyk to speak or present any information to mitigate his sentence.

**CONCLUSION**

For the foregoing reasons, we AFFIRM Wrobel and Stanis-lawczyk's convictions, and AFFIRM Stanislawczyk's sentence.